Rel: March 24, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2022-2023

————————————————

## CR-18-0973

————————————————

## Wayne Holleman Travis

### v.

## State of Alabama

## Appeal from Conecuh Circuit Court
## (CC-92-4.60)

COLE, Judge.

Wayne Holleman Travis, an inmate on Alabama's death row, appeals the circuit court's denial of his Rule 32, Ala. R. Crim. P., petition for postconviction relief.

Facts and Procedural History

The facts, as summarized by the Alabama Supreme Court on direct appeal, are as follows:

"On December 12, 1991, Travis and a friend, Steven Wayne Hall, traveled by bus to Uriah, Alabama. Paula Jean Shiver, a friend of Hall's, met them and drove them to her parents' home. Travis and Hall stayed with Shiver until December 14, when she drove them to the home of Travis's parents. Travis and Hall stayed there from 6:30 p.m. to approximately 7:05 p.m., and then left on foot. The home of the murder victim, 69-year-old widow Clarene Haskew, was approximately one mile away by road.

"Sometime shortly after 7:00 p.m., Travis and Hall arrived at the home of Jessie Wiggins, an elderly woman, and asked to use the telephone. They dialed several numbers and then left. Wiggins's home was approximately one mile from the victim's home.

"Later that evening, at approximately 10:30 p.m., Nellie Shad returned to her home and found that it had been burglarized; she described it as 'completely trashed.' A .38 caliber Rossi revolver and a .410-gauge shotgun had been taken. Shad drove to her sister's house, located several miles away, and telephoned the county sheriff's office. Shad's home was approximately one-fourth mile from the victim's home.

"On the morning of December 15, Wiggins went to the victim's home. She saw that the telephone wire leading into the house had been cut and that the porch and kitchen doors had been smashed in. Wiggins did not go in the home, but returned to her own home and telephoned the son of the victim.

2

"Later that morning, Conecuh County sheriff's deputies found Haskew's body in the kitchen of her home, which had been vandalized and burglarized. A pentagram had been spray-painted on a kitchen cabinet and the words 'thunder struck' had been spray-painted on the floor, beside her body. Missing were silverware, an address book, and Haskew's 1982 Ford LTD. A Ford pickup parked in a shed was found with its steering column open and wires pulled out. An autopsy determined that Haskew had suffered two gunshot wounds to the back of her head. She had also suffered a number of blunt-force injuries to her head and body, her throat and extremities were bruised, and her hyoid bone, situated at the base of the tongue, was broken.

"Earlier that same morning, Travis and Hall had returned to Shiver's home. Sometime between 4:00 and 5:00 a.m., they drove up in Haskew's 1982 Ford LTD and parked it behind a camper. Travis stayed in the car most of the day and told Shiver that the car belonged to his sister-in-law. Travis went into the Shiver home around 6:00 p.m. that evening. Sometime later, the Monroe County sheriff arrived at the residence. When Shiver called out that the sheriff was there, Travis and Hall fled out the back door and went into the woods. The sheriff's department used tracking dogs from a nearby prison to track Travis and Hall through the woods to a 'kudzu patch.' A gunfight ensued; in that gunfight, law enforcement officers wounded both Travis and Hall.

"When Travis was searched, officers found on his person the keys to the victim's automobile, five .38 caliber bullets, and his driver's license. When officers searched Haskew's automobile, they found in the automobile's glove compartment the .38 caliber Rossi revolver stolen from the Shad residence, and they found in the trunk the .410-gauge shotgun, the silverware, and the address book. Forensic tests later determined the .38 caliber revolver to be the weapon that had been used to shoot the victim."

3

Ex parte Travis, 776 So. 2d 874, 876-77 (Ala. 2000).

Travis was indicted for and convicted of capital murder for killing Haskew during a first-degree burglary, a violation of § 13A-5-40(a)(4), Ala. Code 1975. The jury -- by a vote of 11 to 1-- recommended that Travis be sentenced to death. The trial court followed that recommendation.

On direct appeal, this Court affirmed Travis's capital-murder conviction and death sentence. See Travis v. State, 776 So. 2d 819 (Ala. Crim. App. 1997). The Alabama Supreme Court affirmed this Court's judgment. See Ex parte Travis, supra. This Court issued a certificate of judgment on July 18, 2000, making Travis's capital-murder conviction and sentence final.[1]

Travis timely filed a Rule 32 petition challenging his capital-murder conviction and death sentence on January 3, 2002.[2] (C. 12-82.)

---

[1]The Supreme Court of the United States denied Travis's petition for a writ of certiorari on January 8, 2001. See Travis v. Alabama, 531 U.S. 1081 (2001).

[2]"Rule 32.2(c), Ala. R. Crim. P., was amended effective August 1, 2002, to reduce the limitations period from two years to one year; however, for those cases that became final before August 1, 2001, the two-year limitations period applies. See Hyde v. State, 950 So. 2d 344 (Ala. Crim. App. 2006)." Bryant v. State, 29 So. 3d 928, 933 n.2 (Ala. Crim. App. 2009). Because Travis's conviction became final on July 18, 2000, the two-year limitations period applied to his Rule 32 petition.

Thereafter, Travis amended his Rule 32 petition five times. (C. 447-517; 759-838, 1088-170, 1605-93, and 2003-100.) The State answered and moved to dismiss each petition. (C. 531-697, 839-1026, 1175-1378, 1701-1919, and 2127-2280.)

In his fourth amended petition, Travis alleged, among other things, that his trial counsel were ineffective during the guilt phase of his trial because:

- They "failed to conduct an adequate investigation in preparation for [his] trial" because they "failed to interview or meet with [him] outside of court" (C. 1611), "failed to conduct an adequate independent investigation in preparation for the guilt phase of [his] trial" (C. 1613), failed "to procure necessary psychological and neuropsychological expert assistance" (C. 1615), and failed "to procure other necessary expert assistance" (C. 1618).

- They "failed to effectively challenge the State's presentation of trial evidence against [him]," including "fail[ing] to challenge the State's investigation and presentation of its case, fail[ing] to cross examine State witnesses adequately, and fail[ing] to object to the State's introduction of irrelevant and prejudicial evidence." (C. 1620-23.)

- They "failed to protect [his] rights at trial" because they failed "to object to the State's introduction of inadmissible and highly prejudicial evidence" and "did not object to the State's improper presentation of emotionally charged testimony from two of the victim's children." (C. 1623-25.)

5

- They "failed to present a coherent theory of defense to the jury in both the opening statement and closing argument." (C. 1625-26.)

Travis also alleged generally that his trial counsels' alleged errors during the guilt phase of his trial "prejudiced [him] and violated his constitutional rights." (C. 1626-27.)

Travis further alleged that his trial counsel were ineffective during the penalty phase of his trial because:

- They "failed to conduct an adequate investigation in preparation for the sentencing phase of [his] trial" because, he says, his counsel "failed to interview or meet with [him] outside of court" (C. 1629), "failed to conduct an adequate independent investigation in preparation for the sentencing of Mr. Travis at trial" (C. 1630), and failed "to procure necessary psychological and neuropsychological expert assistance" (C. 1632).

- They "failed to make an effective presentation of evidence regarding Mr. Travis's early childhood in the custody of his mother." (C. 1634-37.)

- They "failed to investigate and present evidence of [his] life in foster care and his early years with his adoptive family." (C. 1637-40.)

- They "failed to investigate or present any evidence of [his] post-traumatic adolescence." (C. 1640-43.)

- They "failed to provide expert testimony about [his] psychological problems and the effects of his early childhood trauma." (C. 1643-46.)

6

- They "failed to make an effective presentation of documentary evidence." (C. 1646-48.)

- They "failed to present evidence regarding the relationship between [him] and Steven Hall." (C. 1648.)

- They "failed to protect [his] rights at the sentencing phase." (C. 1649-51.)

- Their "closing argument during sentencing was deficient." (C. 1651-52.)

As he did with his guilt-phase claims, Travis also alleged generally that his trial counsels' alleged errors during the penalty phase of his trial were "prejudicial to [him] and violated his constitutional rights." (C. 1652-53.)

On July 7, 2017, after conducting an in-court argument about the claims raised in Travis's fourth amended petition, the circuit court granted him an evidentiary hearing on his claims that his trial counsel were ineffective during the guilt phase and penalty phase of his trial.[3]

---

[3]The circuit court summarily dismissed many of Travis's claims and it also gave him an opportunity to amend some of his claims. But Travis does not challenge on appeal any of the claims that the circuit court summarily dismissed or any of the claims that the circuit court allowed him to amend. Because Travis has not raised those claims on appeal, this Court will not consider them. See Boyd v. State, 913 So. 2d 1113, 1145 (Ala. Crim. App. 2003) ("Claims presented in a Rule 32 petition but not pursued on appeal are deemed to be abandoned.").

7

(C. 1998-2002.) Before the evidentiary hearing, Travis filed a fifth amended petition on August 7, 2017. (C. 2003-2100.)

Thereafter, the circuit court held an evidentiary hearing on Travis's claims of ineffective assistance of counsel.[4] (See Evid. Hrg. Oct. 2017; R. 1-474; Evid. Hrg. Nov. 2017, R. 1-297; and Evid. Hrg. Oct. 2018, R. 1-608.) At the outset of the evidentiary hearing, the circuit court noted that Travis had filed a fifth amended petition, but Travis's counsel explained that there were no new issues raised in his fifth amended petition; instead, they "went through and supplemented [their] pleadings to the ineffective assistance of counsel claims per discussion with [the assistant attorney general] during the July hearing," and they "supplemented a few pleadings to a few other claims." (Evid. Hrg. Oct. 2017, R. 8-9.) The circuit court explained that, in its order, it would address Travis's claims

---

[4]Travis's evidentiary hearing was held on two separate weeks nearly a year apart. The first part of his evidentiary hearing was held from October 30, 2017, through November 1, 2017, and the second part of his evidentiary hearing was held from October 29, 2018, through October 31, 2018.

as they are presented in his fifth amended petition. (Evid. Hrg. Oct. 2017, R. 10-11.)[5]

At the hearing, Travis presented testimony from Dr. Michael Brook, Dr. Marti Loring, Cary Travis, John Barnett, George Elbrecht, and Robert King. Travis also submitted affidavits from Linda Timpson, Barbara Nihill, and Dr. Loring. The State presented testimony from Dr. Glen King. The State also submitted affidavits from Elbrecht, Robert King, and Allen McGraw, as well as transcripts from the depositions of Cary Travis and Melissa Bartlett. After the hearing, the circuit court allowed both parties to file post-hearing briefs.

In his post-hearing brief, Travis argued the claims of ineffective assistance of counsel that he presented in his fifth amended petition that, he said, he had proved at the evidentiary hearing. But Travis also argued that he proved other claims of ineffective assistance of counsel that he did not present in either his original petition or in any of the five amendments to his petition. (C. 2438-2539.) Thereafter, both Travis and

---

[5]A review of the record on appeal confirms that the issues listed previously from Travis's fourth amended petition are virtually identical to the issues presented in his fifth amended petition.

the State submitted to the circuit court proposed final orders. (See Fifth Supplemental Record on Appeal, C. 2-246.)

On May 7, 2019, the circuit court issued an 88-page order denying the claims Travis presented at the evidentiary hearing. (C. 4067-4154.) The circuit court did not address any of the specific claims of ineffective assistance of counsel that Travis argued for the first time in his post-hearing brief. Travis filed no post-judgment motions challenging the circuit court's judgment. This appeal follows.

## Standard of Review

On appeal, Travis challenges the circuit court's judgment as to those claims of ineffective assistance of counsel he presented in his fifth amended petition that the circuit court denied. Travis also presents to this Court the claims of ineffective assistance of counsel that he raised for the first time in his post-hearing brief that the circuit court did not address in its order denying him postconviction relief.

As to the arguments Travis raises on appeal that concern the claims of ineffective assistance of counsel that he presented in his fifth amended petition, which the circuit court gave him an opportunity to prove at the

evidentiary hearing, and which the circuit court denied, the standard of

review is well settled:

> "'"The burden of proof in a Rule 32
> proceeding rests solely with the petitioner, not the
> State." <u>Davis v. State</u>, 9 So. 3d 514, 519 (Ala.
> Crim. App. 2006), rev'd on other grounds, 9 So. 3d
> 537 (Ala. 2007). "[I]n a Rule 32, Ala. R. Crim. P.,
> proceeding, the burden of proof is upon the
> petitioner seeking post-conviction relief to
> establish his grounds for relief by a preponderance
> of the evidence." <u>Wilson v. State</u>, 644 So. 2d 1326,
> 1328 (Ala. Crim. App. 1994). Rule 32.3, Ala. R.
> Crim. P., specifically provides that "[t]he
> petitioner shall have the burden of ... proving by a
> preponderance of the evidence the facts necessary
> to entitle the petitioner to relief."'

"<u>Wilkerson v. State</u>, 70 So. 3d 442, 451 (Ala. Crim. App. 2011).

> "'[W]hen the facts are undisputed and an appellate
> court is presented with pure questions of law, that court's
> review in a Rule 32 proceeding is de novo.' <u>Ex parte White</u>,
> 792 So. 2d 1097, 1098 (Ala. 2001). Also, 'where a trial court
> does not receive evidence ore tenus, but instead makes its
> judgment based on the pleadings, exhibits, and briefs, ... it is
> the duty of the appellate court to judge the evidence de novo.'
> <u>Ex parte Horn</u>, 718 So. 2d 694, 705 (Ala. 1998). Likewise,
> when a trial court makes its judgment 'based on the cold trial
> record,' the appellate court must review the evidence de novo.
> <u>Ex parte Hinton</u>, 172 So. 3d 348, 352 (Ala. 2012).

> "'However, where there are disputed facts in a
> postconviction proceeding and the circuit court resolves those
> disputed facts, "[t]he standard of review on appeal ... is
> whether the trial judge abused his discretion when he denied
> the petition."' <u>Boyd v. State</u>, 913 So. 2d 1113, 1122 (Ala. Crim.

App. 2003) (quoting <u>Elliott v. State</u>, 601 So. 2d 1118, 1119 (Ala. Crim. App. 1992)). 'When conflicting evidence is presented ... a presumption of correctness is applied to the court's factual determinations.' <u>State v. Hamlet</u>, 913 So. 2d 493, 497 (Ala. Crim. App. 2005). This is true 'whether the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence.' <u>Parker Towing Co. v. Triangle Aggregates, Inc.</u>, 143 So. 3d 159, 166 (Ala. 2013) (citations omitted). 'The credibility of witnesses is for the trier of fact, whose finding is conclusive on appeal. This Court cannot pass judgment on the truthfulness or falsity of testimony or on the credibility of witnesses.' <u>Hope v. State</u>, 521 So. 2d 1383, 1387 (Ala. Crim. App. 1988). Indeed, it is well settled that, in order to be entitled to relief, a postconviction 'petitioner must convince the trial judge of the truth of his allegation and the judge must "believe" the testimony.' <u>Summers v. State</u>, 366 So. 2d 336, 343 (Ala. Crim. App. 1978). <u>See also</u> <u>Seibert v. State</u>, 343 So. 2d 788, 790 (Ala. 1977)."

<u>George v. State</u>, 333 So. 3d 1022, 1031-32 (Ala. Crim. App. 2019). Additionally, we note that when reviewing these Rule 32 claims the plain-error standard does not apply. <u>See</u> <u>Ex parte Dobyne</u>, 805 So. 2d 763, 766 (Ala. 2001).

As to the arguments Travis raises on appeal that concern the claims he raised for the first time in his post-hearing brief, this Court will not address those claims for the following reasons.

It is well settled that "[t]he general rules of preservation apply to Rule 32 proceedings" -- even in postconviction proceedings that involve

the death penalty. <u>Boyd v. State</u>, 913 So. 2d 1113, 1123 (Ala. Crim. App. 2003) (collecting cases). Based on those general rules of preservation, this Court has held that a Rule 32 petitioner cannot raise on appeal a postconviction claim that was not included in either his original petition or in any of his amendments to his petition. <u>See</u> <u>Arrington v. State</u>, 716 So. 2d 237, 239 (Ala. Crim. App. 1997) ("An appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.").

Of course, Travis concedes in his reply brief that he raises claims on appeal that were not raised in his original petition or in any of the five amendments to his petition that he filed before the evidentiary hearing. Travis argues, however, that his post-hearing brief claims are properly before this Court because, he says, they were "raised" at the evidentiary hearing and presented in his post-hearing brief.

For example, the first issue Travis raises in his brief on appeal is that his trial counsel were ineffective "during jury voir dire" because they "failed to ask whether some potential jurors knew Travis." (Travis's brief, p. 46.) Travis did not raise this claim of ineffective assistance of counsel in his original petition or in any of the five amendments to his petition.

13

Instead, Travis asked his counsel questions during the evidentiary hearing about voir dire (Evid. Hrg. Oct. 2018, R. R. 181-84, 337-39), and, after the hearing, Travis argued for the first time in his post-hearing brief that his counsel were ineffective "during jury voir dire" (C. 2488-89).

In his reply brief, Travis argues that this specific claim of ineffective assistance of counsel is properly before this Court because he "argued in the Post-Hearing Brief and raised at the Rule 32 Hearing that trial counsel failed to conduct adequate questioning or investigation during voir dire to discover that the jury foreman was Travis's grade school teacher." (Travis's reply brief, p. 20.) Travis also says that, by asking questions about a claim at an evidentiary hearing and by raising a specific claim of ineffective assistance of counsel in a post-hearing brief, the "State and the Rule 32 court ... had notice of these issues and opportunity to respond, and [thus he] is not improperly raising them for the first time on appeal." (Travis's reply brief, p. 23.)

As best as we can tell, Travis's argument that his post-hearing-brief claims are properly before this Court is premised on his belief that a Rule 32 petitioner's asking questions of a witness at an evidentiary hearing about facts concerning claims that were not raised in a Rule 32 petition

14

or in any amendment to that petition and, after the evidentiary hearing, arguing for the first time in a post-hearing brief that he is entitled to relief on claims of ineffective assistance of counsel based on those questions and the responses to those questions, is the functional equivalent of amending a Rule 32 petition, making those newly raised claims ripe for appeal. This Court disagrees with this argument.

Merely asking questions of a witness at an evidentiary hearing about facts concerning some previously unpleaded and unspecified claim for postconviction relief is not the equivalent of either properly "raising" a claim for postconviction relief or properly amending a Rule 32 petition under Rule 32.7(b), Ala. R. Crim. P. To hold otherwise would convert a Rule 32 evidentiary hearing from a proceeding at which a petitioner must prove a properly pleaded claim into a discovery tool that would allow a petitioner to use an evidentiary hearing to seek out information about claims that were not alleged in a Rule 32 petition or in any amendment to that petition. A Rule 32 evidentiary hearing is narrow in scope, and it is neither a discovery tool nor is it a venue to explore the possibility of the existence of new claims. The purpose of a Rule 32 evidentiary hearing is to give a petitioner the opportunity to satisfy his or her burden of proof

15

as to claims that were properly raised and sufficiently pleaded in a Rule 32 petition and only if those claims are "meritorious on their face." See Jackson v. State, 133 So. 3d 420, 444-45 (Ala. Crim. App. 2009) ("Neither this Court nor the Alabama Supreme Court has ever held that an evidentiary hearing must be conducted on every postconviction petition that raises a claim of ineffective assistance of counsel. Such a requirement would burden an already overburdened judiciary. 'An evidentiary hearing on a coram nobis petition [now Rule 32 petition] is required only if the petition is "meritorious on its face." Ex parte Boatwright, 471 So. 2d 1257 (Ala. 1985).' Moore v. State, 502 So. 2d 819, 820 (Ala. 1986).").

Although Travis contends that his claims are properly before this Court because he "raised" them in his post-hearing brief, this Court has held that raising new claims in a post-hearing brief is not the equivalent of properly amending a petition under Rule 32.7(b). See McGahee v. State, 885 So. 2d 191, 219 (Ala. Crim. App. 2003) (holding that, "although McGahee presented this argument in his post-hearing brief, that presentation was not, as McGahee argues, equivalent to an amendment to the petition pursuant to Rule 32.7, Ala. R. Crim. P.," and noting that

16

"McGahee's argument that he could not have presented this claim until after the evidence had been presented at the evidentiary hearing is specious" because "McGahee's second amended petition contained dozens of claims and subclaims, none of which could be proven until evidence was taken"). Thus, the claims Travis argued for the first time in his post-hearing brief were not properly presented to the circuit court, and, consequently, are not properly before this Court for appellate review.

But even if we construed Rule 32 in such a way that would allow a petitioner to "amend" his or her Rule 32 petition by asking questions during an evidentiary hearing and by raising claims based on those questions for the first time in a post-hearing brief, which we do not, Travis's claims would still not be properly before this Court. As Travis points out in his reply brief, the circuit court did not rule on the claims he raised for the first time in his post-hearing brief. In other words, Travis never obtained an adverse ruling on any of the claims that he raised in his post-hearing brief. What is more, Travis did not file any post-judgment motions in the circuit court arguing that the circuit court failed to rule on these claims when it denied him postconviction relief. So, even if we viewed these claims as having been raised in an "amended"

17

petition, "[b]ecause [Travis] never objected to the circuit court's failure to rule on his amended petition and because he suffered no adverse ruling on the amended petition from the circuit court, th[ose] issue[s] [are] not properly before this court for review." Boyd, 913 So. 2d at 1124.

In sum, the arguments Travis raises on appeal that were presented in his petition and that the circuit court denied are properly before this Court, but the arguments Travis raises on appeal that were presented to the circuit court for the first time in his post-hearing brief are not properly before this Court for appellate review.

Finally, before turning to Travis's arguments on appeal, we note that the State correctly points out that Travis's "opening brief resembles more of an amended Rule 32 petition than an appellate brief" in the sense that it presents claims of ineffective assistance of counsel to this Court as if this Court was a circuit court. (State's brief, p. ii.) In so doing, Travis presents claims that, as discussed above, he did not present in his Rule 32 petition or in any properly amended petition; he uses his brief on appeal to modify claims that he either raised in his petition or in a properly filed amended petition by supporting those claims with new factual allegations; and, in many instances, "merely re-raises claims that

he raised in his fifth amended petition and asserts that he is entitled to relief" without "engag[ing] with the circuit court's final order" or addressing the court's "findings and conclusions with regard to those claims, much less argu[ing] why he believes that the circuit court erred in denying them." (State's brief, p. ii.) We will address the claims that Travis raises on appeal that fall into the above-mentioned categories with the following well settled principles in mind: (1) when a petitioner "raise[s] on appeal different or more specific factual allegations in support of a postconviction claim that were not included in his or her petition," those newly raised allegations are not properly before this Court, Woodward v. State, 276 So. 3d 713, 771 (Ala. Crim. App. 2018); and (2) when a petitioner merely restates allegations that he or she raised in a Rule 32 petition without explaining to this Court how the circuit court erred by providing this Court with citations to legal authority supporting those arguments, that petitioner has not satisfied Rule 28(a)(10), Ala. R. App. P., and his or her claims are deemed abandoned and waived. See, e.g., Calhoun v. State, 261 So. 3d 457, 472-73 (Ala. Crim. App. 2016) (holding that Calhoun failed to "adequately argue" his claims on appeal because he "merely restate[d] these

19

allegations from his petition," argued that the allegations in his petition showed that his counsel was ineffective, and failed to cite "legal authority to support these contentions"). With these principles in mind, we now turn to Travis's arguments on appeal.

Discussion

On appeal, Travis argues that the circuit court erred when it denied his claims of guilt-phase ineffective assistance of counsel and his claims of penalty-phase ineffective assistance of counsel. Travis further argues that the circuit court erred when it "failed to consider the cumulative effect" of his trial counsels' ineffective assistance.

It is well settled that,

> "'[t]o prevail on a claim of ineffective assistance of counsel, the petitioner must show (1) that counsel's performance was deficient and (2) that the petitioner was prejudiced by the deficient performance. See Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

> "'"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or

20

omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."

"'Strickland, 466 U.S. at 689, 104 S. Ct. 2052.

"'"[T]he purpose of ineffectiveness review is not to grade counsel's performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S. Ct. [2052] at 2065 [(1984)]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir. 1992) ('We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.'). We recognize that '[r]epresentation is an art, and an act or omission that is unprofessional

21

in one case may be sound or even brilliant in another.' <u>Strickland</u>, 104 S. Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.' <u>Burger v. Kemp</u>, 483 U.S. 776, 107 S. Ct. 3114, 3126, 97 L. Ed. 2d 638 (1987)."

"'<u>Chandler v. United States</u>, 218 F.3d 1305, 1313-14 (11th Cir. 2000) (footnotes omitted).

"'An appellant is not entitled to "perfect representation." <u>Denton v. State</u>, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). "[I]n considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" <u>Burger v. Kemp</u>, 483 U.S. 776, 794, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987).'

"<u>Yeomans v. State</u>, [195] So. 3d [1018], [1026] (Ala. Crim. App. 2013). ...

"We also recognize that when reviewing claims of ineffective assistance of counsel 'the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.' <u>Strickland v. Washington</u>, 466 U.S. 668, 698, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)."

Marshall v. State, 182 So. 3d 573, 582-83 (Ala. Crim. App. 2014).

Additionally, because the claims Travis raises on appeal concern claims of ineffective assistance of counsel that he had an opportunity to prove at an evidentiary hearing, we also note that

> "'the presumption that counsel performed effectively "'is like the "presumption of innocence" in a criminal trial,"' and the petitioner bears the burden of disproving that presumption. Hunt v. State, 940 So. 2d 1041, 1059 (Ala. Crim. App. 2005) (quoting Chandler v. United States, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc)). "Never does the government acquire the burden to show competence, even when some evidence to the contrary might be offered by the petitioner." Id. "'"An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation]. Therefore, 'where the record is incomplete or unclear about [counsel]'s actions, [a court] will presume that he did what he should have done, and that he exercised reasonable professional judgment.'"'" Hunt, 940 So. 2d at 1070-71 (quoting Grayson v. Thompson, 257 F.3d 1194, 1218 (11th Cir. 2001), quoting in turn Chandler, 218 F.3d at 1314 n.15, quoting in turn Williams v. Head, 185 F.3d 1223, 1228 (11th Cir. 1999)). Thus, to overcome the strong presumption of effectiveness, a Rule 32 petitioner [ordinarily] must, at his evidentiary hearing, question trial counsel regarding his or her actions and reasoning. See, e.g., Broadnax v. State, 130 So. 3d 1232, 1255-56 (Ala. Crim. App. 2013) (recognizing that "[i]t is extremely difficult, if not impossible, to prove a claim of ineffective

23

assistance of counsel without questioning counsel about the specific claim, especially when the claim is based on specific actions, or inactions, of counsel that occurred outside the record[, and holding that the] circuit court correctly found that Broadnax, by failing to question his attorneys about this specific claim, failed to overcome the presumption that counsel acted reasonably"); Whitson v. State, 109 So. 3d 665, 676 (Ala. Crim. App. 2012) (holding that a petitioner failed to meet his burden of overcoming the presumption that counsel were effective because the petitioner failed to question appellate counsel regarding their reasoning); … McGahee v. State, 885 So. 2d 191, 221-22 (Ala. Crim. App. 2003) ("[C]ounsel at the Rule 32 hearing did not ask trial counsel any questions about his reasons for not calling the additional witnesses to testify. Because he has failed to present any evidence about counsel's decisions, we view trial counsel's actions as strategic decisions, which are virtually unassailable."); Williams v. Head, 185 F.3d at 1228; Adams v. Wainwright, 709 F.2d 1443, 1445-46 (11th Cir. 1983) ("[The petitioner] did not call trial counsel to testify ... [; therefore,] there is no basis in this record for finding that counsel did not sufficiently investigate [the petitioner's] background.").'

"Stallworth v. State, 171 So. 3d 53, 92-93 (Ala. Crim. App. 2013) (emphasis added)."

Brooks v. State, 340 So. 3d 410, 439-40 (Ala. Crim. App. 2020). With these principles in mind, we address Travis's claims of ineffective assistance of counsel.

### I. Guilt-Phase Claims of Ineffective Assistance of Counsel

24

## I.A.

Travis first argues that his counsel "were ineffective during jury voir dire." (Travis's brief, pp. 45-47.) Travis, however, did not raise this claim in his Rule 32 petition or in any of the five amendments to his petition. Rather, Travis presented this specific claim of ineffective assistance of counsel to the circuit court for the first time in his post-hearing brief (C. 2488-89), and what is more, he never obtained an adverse ruling on this claim. Consequently, as explained above, Travis's argument on appeal is not properly before this Court.

## I.B.

Travis next argues that his "lead counsel was ineffective during opening statements." (Travis's brief, p. 48.) According to Travis, his counsel "used the opening statement to distance himself from Travis instead of explaining any theory of the case or the evidence he was planning to present." (Travis's brief, p. 48 (footnote omitted).) Travis says that his counsel did not mention Travis's codefendant, Steven Hall, "but made sure to put in a plug for himself"; "did not say anything to the jury about the evidence that he knew or should have known would show that Travis was not guilty of capital murder"; "did not explain the State's

25

burden to prove beyond a reasonable doubt Travis had a specific intent to murder or aid the murder as a predicate for finding him guilty"; "failed to explain how the evidence could allow the jury to conclude that Travis did not know Hall was going to kill Ms. Haskew, or any other alternative theory of the case based on the evidence"; and "did not even mention felony murder in his opening statement." (Travis's brief, pp. 48-49.)

In his fifth amended petition, Travis alleged that his counsel were ineffective because they "failed to present a coherent theory of defense to the jury." (C. 2025.) In raising that claim, Travis alleged:

"Defense Counsel's insufficient opening statement and closing argument made no mention of the alternative view that Steven Hall alone shot and killed Clarene Haskew, with no aid from Mr. Travis. Indeed, this alternative theory would have comported entirely with Mr. Hall's sworn testimony at his plea hearing in which he admitted under oath that he -- not Mr. Travis -- was solely responsible for beating, strangling, and shooting Mrs. Haskew.[6] Defense Counsel also failed to explain to the jury that the prosecution was relying solely on circumstantial evidence. Nor did Defense Counsel ever explain felony murder to the jury, which could have been argued as a defense alternative to capital murder. Defense Counsel also failed to demonstrate to the jury that

_____

[6]At his evidentiary hearing, Travis admitted as "Petitioner's Exhibit 16" a copy of the reporter's transcript from Steven Hall's guilty-plea proceeding. (Fourth Supplemental Record on Appeal, C. 1558-81.) Although Hall admitted he was guilty of capital murder, Hall did not admit during that proceeding that he had acted alone in killing Haskew. (Fourth Supplemental Record on Appeal, C. 1573-74.)

the State did not present sufficient evidence to prove intent to kill, an essential element of first degree murder."

(C. 2025-26 (footnote omitted).) The circuit court gave Travis an opportunity to prove this claim at an evidentiary hearing, and it gave Travis an opportunity to file a post-hearing brief to show how he satisfied his burden of proof as to this claim.

In his post-hearing brief, however, Travis modified the claim he presented in his fifth amended petition, arguing that his counsel were ineffective "during opening statement." (C. 2489.) In making his argument, Travis reasserted his allegation that his counsel failed to mention felony murder in the opening statement. (C. 2491.) Travis also added new factual allegations showing why, he thought, his counsel were ineffective during the opening statement, including that "counsel used the opening statement to distance himself from Mr. Travis instead of explaining his (or any) theory of the case or the evidence he was planning to present"; that "counsel did not even mention Mr. Hall, but he made sure to put in a plug for himself"; that counsel "did not say anything to the jury about the evidence that he knew or should have known about that would show that Mr. Travis was not guilty of capital murder"; that counsel "did not explain the state's burden to prove beyond a reasonable

27

doubt Mr. Travis had had a specific intent to murder or aid the murder as a predicate for a finding him guilty"; and that counsel "failed to explain how the evidence could allow the jury to conclude that Mr. Travis did not know Mr. Hall was going to kill Ms. Haskew, or any other alternative theory of the case based on the evidence." (C. 2490-91.)

The new factual allegations that Travis raised in his post-hearing brief as to his counsels' effectiveness during opening statement are not properly before this Court because they were not included in either Travis's Rule 32 petition or in any of the five amendments to his petition. See Bryant v. State, 181 So. 3d 1087, 1108 (Ala. Crim. App. 2011) ("We note that Bryant alleges additional, and more specific, facts in his brief on appeal regarding this claim. However, these factual allegations were not included in his petition or amended petitions; therefore, they are not properly before this Court for review and will not be considered."). Consequently, the only argument properly before this Court on appeal is Travis's claim that is counsel were ineffective for failing to "mention felony murder in his opening statement." (Travis's brief, pp. 48-49.) Travis's claim is without merit.

> "In People v. Leeper, 317 Ill. App. 3d 475, 251 Ill. Dec. 202, 740 N.E.2d 32 (2000), the Illinois Court of Appeals made

the following observations concerning an attorney's performance during opening statements:

> "'[Counsel] made only a perfunctory opening statement and closing argument. Counsel is not required by law to make an opening statement at all. Pietsch v. Pietsch, 245 Ill. 454, 456-57, 92 N.E. 325, 326 (1910). [Counsel's] opening statement was short; however, it explained what [counsel], in his professional judgment, thought was necessary. Specifically, [counsel] explained that the burden of proof was on the State and suggested that the jury listen carefully to both versions of the events. ... The contents of the opening statement and closing argument clearly lie within the professional judgment of counsel and, thus, cannot support a claim of ineffective assistance of counsel.'

"317 Ill. App. 3d at 484, 251 Ill. Dec. 202, 740 N.E.2d at 40. See also Gregory G. Sarno, Annotation, Adequacy of Defense Counsel's Representation of Criminal Client Regarding Argument, 6 A.L.R. 4th 16 (1981)."

Washington v. State, 95 So. 3d 26, 54 (Ala. Crim. App. 2012). Because opening statement is a matter of trial strategy that clearly lies within the judgment of counsel, "'[w]ithout some explanation as to why counsel acted as he did, we presume that his actions were the product of an overall strategic plan.' Tong v. State, 25 S.W.3d 707, 714 (Tex. Crim. App. 2000)." Washington, 95 So. 3d at 54.

Here, during the evidentiary hearing, Travis asked the trial counsel who gave the opening statement and the closing argument -- George

Elbrecht -- questions about the felony-murder argument he made to the jury during closing argument (see Evid. Hrg. Oct. 2018, R. 213), but Travis did not ask Elbrecht any questions during the evidentiary hearing about his not mentioning felony murder to the jury during the opening statement. "When the record is silent as to why counsel performed a certain way[,] we must presume that counsel's actions were reasonable. See Grayson [v. Thompson, 257 F.3d 1194 (11th Cir. 2001)]." Washington, 95 So. 3d at 54. Because Travis did not ask his counsel any questions about his reasoning for not mentioning felony murder during the opening statement, Travis failed to prove that his counsels' performance was deficient.

Moreover, Travis failed to prove that he was prejudiced by his counsels' failure to mention felony murder to the jury during the opening statement when -- as Travis conceded in his questioning of his counsel and as the circuit court noted when it denied Travis's claim -- Travis's trial counsel argued felony murder to the jury during the closing argument. (C. 4112-13.) Because Travis failed to satisfy his burden of proof as to this claim, the circuit court did not err when it denied Travis's claim.

## I.C.

Travis next argues that his "trial counsel were ineffective because they failed adequately to prepare and investigate." (Travis's brief, pp. 49-59.) Specifically, Travis argues that his counsel "did not devote the time or resources needed to defend Travis's case" (Travis's brief, p. 51); "failed to investigate and present crucial and exculpatory evidence" (Travis's brief, p. 53); and "fail[ed] to investigate applicable legal theories" (Travis's brief, p. 57). We address each argument in turn.

## I.C.1.

Travis argues that his counsel were ineffective because, he says, they "did not devote the time or resources needed to defend Travis's case, and were therefore unprepared for trial." (Travis's brief, p. 51.) According to Travis, his counsel "asked for numerous breaks so that he could look for case law or read documents" and "even admitted he was unprepared, attributing it to the fact that he was 'limited by funds and time.'" (Travis's brief, p. 51.) Travis also argues that his counsel "were so unprepared that [the trial judge] at times had to do their job for them." (Travis's brief, p. 53.) Travis did not raise this claim in his Rule 32 petition or in any of the five amendments to his petition. Rather, Travis

presented this claim of ineffective assistance of counsel to the circuit court for the first time in his post-hearing brief, and, what is more, he never obtained an adverse ruling on this claim. (C. 2487-88.) Consequently, Travis's argument is not properly before this Court.

<u>I.C.2.</u>

Travis next argues that his counsel were ineffective because, he says, they "failed to investigate and present crucial and exculpatory evidence." (Travis's brief, p. 53.) Specifically, Travis argues that his counsel failed to investigate and present:

- Evidence "that 'Thunderstruck' -- the phrase written over the victim's body -- was the name of Hall's favorite ACDC song." (Travis's brief, p. 54.)

- Evidence that the "'e' in the word 'Thunderstruck' painted at the victim's home was written in a distinctive backwards 3 manner -- the same as the way Hall had written the 'e's' in his Satanic bible." According to Travis, a "handwriting expert or even a lay person's review of Hall's other handwriting easily would have provided even more conclusive evidence that Hall was the one who took the time to paint around the victim's body." (Travis's brief, p. 54.)

- Evidence from Paula Shiver, Hall's girlfriend, "that the hand-written Satanic bible recovered from Hall and Travis belonged to Hall." (Travis's brief, p. 55.)

- Evidence of Travis's "distance from Satanism" and his lack of "connection to Satanism, the phrase

'Thunderstruck' or the pentagram."  (Travis's brief, p. 55.)

- Evidence that the reason Travis "stayed with Hall the night of the murder is because he reasonably believed that had he tried to turn Hall into the police, Hall would have killed him and/or his parents."  (Travis's brief, p. 55.)

- Evidence that "[a] comparison of footwear impressions at the crime scene to Travis's shoes showed no match." (Travis's brief, p. 55.)

- Evidence of Travis's admission "to having a screwdriver on the night in question, which was supportive of his consistent story that he had been hotwiring a car when Hall decided on his own to enter the victim's house and kill her."  (Travis's brief, p. 55.)

- Evidence that "no blood (or any other physical evidence) was found on Travis or any of his clothing or possessions."  (Travis's brief, p. 56.)

- Evidence that "Travis's hair did not match any hairs found on Ms. Haskew's body."  (Travis's brief, p. 56.)

- Evidence from "a forensic or crime scene expert to interpret the evidence of the victim's wounds and explain to the jury how Hall could have committed the crime alone."  (Travis's brief, p. 56.)

(Travis's brief, pp. 54-56.)

In his fifth amended petition, Travis alleged that his counsel were ineffective "for failing to procure other necessary expert assistance" including a "handwriting and graffiti expert, who would have established

33

that the word 'Thunderstruck' spray painted in the house of the victim placed Mr. Hall at the crime scene, not Mr. Travis," and that Travis intended "to proffer the testimony of expert Richard A. Roper, Ph.D., an expert in analyzing handwriting and graffiti, to establish the likelihood that Mr. Hall wrote the word 'Thunderstruck' at the scene of the crime and the lack of likelihood that Mr. Travis was the author."[7]  (C. 2019.)

Travis also alleged in his fifth amended petition that his counsel were ineffective for failing "to effectively challenge the State's presentation of trial evidence against Mr. Travis" because,

> "[a]lthough a substantial amount of blood was found at the crime scene, Defense Counsel failed to explain through a witness or to the jury in closing arguments that Mr. Travis's clothing and belongings were tested for blood and <u>no blood</u> was found.  Defense counsel also failed to demonstrate that footprints found at the scene of the crime did not match Mr. Travis's shoes."

(C. 2020.)  The circuit court gave Travis an opportunity to prove these claims at an evidentiary hearing, and, after the hearing, it gave him an

---

[7]As set out above, in his brief on appeal and in his post-hearing brief, Travis adds to this claim that his counsel were ineffective for failing to present a layperson's opinion as to whether Hall wrote the word "Thunderstruck" in Haskew's house.  This claim is not properly before this Court because it was not presented in either Travis's Rule 32 petition or in any proper amendment to his petition.

opportunity to file a post-hearing brief to show how he met his burden of proof as to these claims.

In his post-hearing brief, Travis combined his claim that his counsel were ineffective "for failing to procure other necessary expert assistance" with his claim that his counsel were ineffective for failing "to effectively challenge the State's presentation of trial evidence against Mr. Travis," creating a new claim -- that his counsel were ineffective because they failed "to investigate and present crucial and exculpatory evidence." (C. 2491-94.) In so doing, Travis alleged that his counsel failed to investigate and present the handwriting expert, blood evidence, and footprint evidence, all of which he raised in his fifth amended petition, but he also added new allegations that his counsel failed to investigate and present certain "crucial and exculpatory" evidence at his trial.

To the extent that Travis's argument on appeal can be construed as challenging the circuit court's denial of the claims that he raised in his fifth amended petition (i.e., his claims concerning his counsel's failure to procure a handwriting or graffiti expert to testify about who wrote the word "Thunderstruck" in Haskew's home and his counsel's failure to adequately present evidence of the absence of Haskew's blood on Travis

and the absence of Travis's footwear impressions at the crime scene), those claims are properly before this Court. Travis's arguments, however, are without merit.

First, Travis failed to prove his claim that his counsel was ineffective for failing to obtain a handwriting and graffiti expert to show that Hall had written the word "Thunderstruck" in Haskew's home. Indeed, as the circuit court noted in its order denying this claim, Travis failed to call any "expert witness in support of this claim." (C. 4094.) Travis failed to prove that there was any expert witness who would have both concluded that Hall wrote "Thunderstruck" and been able and willing to testify at Travis's trial. As this Court has explained, "to obtain relief on a claim that counsel were ineffective for failing to hire an expert witness, the petitioner must first plead the name of that expert, the substance of that expert's testimony, and that the expert is willing and available to testify at the petitioner's trial; then the petitioner must prove each of those allegations at an evidentiary hearing." Brooks v. State, 340 So. 3d 410, 437 (Ala. Crim. App. 2020). Although Travis pleaded that Dr. Roper would testify to "the likelihood that Mr. Hall wrote the word 'Thunderstruck' at the scene of the crime and the lack of likelihood that

Mr. Travis was the author" (C. 2019), Dr. Roper did not testify at the evidentiary hearing and Travis failed to prove that allegation at the evidentiary hearing. Thus, Travis failed to prove his claim that his counsel were deficient in failing to obtain an expert in handwriting and graffiti.

Additionally, Travis failed to prove that he was prejudiced by his counsels' failure. As the circuit court correctly found:

> "Even assuming that his counsel could have located an expert witness who would have offered that testimony at his trial, Travis failed to establish that such testimony would have benefitted his defense. George Elbrecht testified that evidence showing that Hall painted the word at the scene of the crime would not have exculpated Travis and, instead, at most would have inculpated Hall in the commission of the offense."

(C. 4094-95.) Thus, the circuit court did not err when it denied this claim.

Travis also failed to prove his claims that his counsel were ineffective for failing to adequately present evidence of the absence of Haskew's blood on Travis's clothing and for failing to present evidence of the absence of Travis's footwear impressions at the crime scene.

During the evidentiary hearing, Travis's Rule 32 counsel asked Elbrecht about having received blood evidence from the State concerning

the clothes that both Hall and Travis were wearing when they were apprehended by law enforcement:

"[Rule 32 counsel]: Okay. Here is a report that was provided to you by the Alabama Department of Forensic Sciences.

"[Elbrecht]: Right.

"[Rule 32 counsel]: Okay. Do you see that -- it's, like, the fifth one down, one sealed brown paper bag containing clothing from Steve Hall?

"[Elbrecht]: Right.

"[Rule 32 counsel]: One sealed brown paper bag containing clothing from William H. Travis. That's a typo, right?

"[Elbrecht]: Right.

"[Rule 32 counsel]: It's Wayne Travis. You can set that aside.

"And then in CR613, we've got more clothing that was provided, stapled closed and said to contain clothing from the suspect, Wayne Travis.

"Do you see that?

"[Elbrecht]: Right.

"[Rule 32 counsel]: And then we have this one. This refers to additional clothes that were tested by the State.

"If you look at the second line, it's a brown paper bag containing shoes from Wayne Travis.

"[Elbrecht]: Right.

"[Rule 32 counsel]: Right. You understand that those items were tested for blood? Did you understand that, or do you not recall that, sitting here today?

"[Elbrecht]: I don't recall.

"....

"[Rule 32 counsel]: On December 18, 1991, [Alabama Bureau of Investigation] Investigator Simon Benson submitted one sealed bag identified as containing clothing of William. We know it's Wayne Travis. The clothing consisted of a shirt, blue jeans, and men's briefs. Laboratory examination failed to disclose the presence of blood.

"Do you see that?

"[Elbrecht]: Right.

"[Rule 32 counsel]: So, in other words, they tested for blood, Wayne's clothing, and they did not find any; is that correct?

"[Elbrecht]: Right.

"[Rule 32 counsel]: Why did you --

"[Elbrecht]: They didn't find any on Mr. Hall, either, in number 17.

"[Rule 32 counsel]: That's true. But this is your defense of Wayne Travis, correct?

"[Elbrecht]: Right. I'm just saying.

"[Rule 32 counsel]: I understand. But you could have called Ms. Scott and --

"[Elbrecht]: If I called her, it would be in the record. If I didn't call her, it's not in the record.

"[Rule 32 counsel]: I understand. But wouldn't it be useful to call her, to have her testify to the fact that your client didn't have any blood on his clothing?

"[Elbrecht]: Whoever I called, I called; and if I didn't call her, I didn't call her.

"[Rule 32 counsel]: Do you recall if you considered that as part of your strategy?

"[Elbrecht]: It's been 25 years.

"[Rule 32 counsel]: Okay. So you don't know whether you did or not?

"[Elbrecht]: Well, you know, I -- we considered a lot of things back then, but I just -- I don't recall some of those decisions from 25 years ago.

"[Rule 32 counsel]: Okay. And you don't -- sitting here today, can you envision a scenario in which it would have been helpful to your defense, since there was a lot of evidence that they put in circumstantially, to rebut the presumption of the burden of proof, as you said your strategy was?

"[Elbrecht]: I don't understand your question. Ask it again.

"[Rule 32 counsel]: You were trying to rebut and show that the State did not meet its burden of proof, which was --

"[Elbrecht]: That was part of our strategy, yes.

40

"[Rule 32 counsel]: Okay. That's what you said in your affidavit.

"[Elbrecht]: Right.

"[Rule 32 counsel]: Right. So you were trying to establish that the State didn't meet its burden of proof beyond a reasonable doubt and to a moral certainty; is that correct?

"[Elbrecht]: Correct.

"[Rule 32 counsel]: And showing that your client did not have any blood on his clothing, would that tend to help you in your case or hurt you in your case?

"[Elbrecht]: I just -- I don't recall."

(Evid. Hrg. Oct. 2018, R. 404-08.) Travis's Rule 32 counsel also asked

Elbrecht about having received footwear-impression evidence:

"[Rule 32 counsel]: Okay. So I'm going to show you a report prepared by the Alabama Department of Forensic Sciences. Do you recognize that document?

"[Elbrecht]: No.

"[Rule 32 counsel]: Do you see that it's -- the subject line is Clarene Haskew?

"[Elbrecht]: Yes.

"[Rule 32 counsel]: And that two footwear impressions from the crime scene were taken?

"[Elbrecht]: I see that.

"[Rule 32 counsel]: Yeah.  And are you aware that this was provided to you by the State in connection with your preparation for your defense?

"[Elbrecht]: I'm sure it was.

"[Rule 32 counsel]:  Okay. You can put that aside. So there were footwear impressions from the scene.

"Subsequently, at CR626 and 627, there was an analysis done of those footwear impressions by Scott Milroy. Do you see that?

"[Elbrecht]: Yes.

"[Rule 32 counsel]: So let's look at the items that Simon Benson provided to Scott Milroy.

"Item 20 was one sealed brown paper bag containing gauchos, boots, identified as from Steven Hall.  See that?

"[Elbrecht]: Right.

"[Rule 32 counsel]: One sealed brown paper bag containing Red Wing shoes, boots, identified as from Wayne H. Travis, right?

"[Elbrecht]: Right.

"[Rule 32 counsel]: And then he submitted one sealed brown paper bag containing white Reebok tennis shoes, identified as from Wayne Travis.

"[Elbrecht]: Right.

"[Rule 32 counsel]: Okay.  It was requested that the items of evidence submitted above be examined and compared to the footwear impression cast I just gave to you, in 608.

42

"[Elbrecht]: Right.

"[Rule 32 counsel]: Okay. Laboratory examination of the footwear impression cast item 24A revealed insufficient detail for comparison.

"[Elbrecht]: Right.

"[Rule 32 counsel]: Laboratory examination of the footwear impression cast item 24B revealed a partial impression. Comparison of this partial impression to items 21, 22, and 23, suspect's shoes revealed that the impression is not of the same design as the soles of the shoes submitted above.

"Do you see that?

"[Elbrecht]: Right.

"[Rule 32 counsel]: Okay. You didn't offer this information into evidence?

"[Elbrecht]: No, I did not.

"[Rule 32 counsel]: And why is that?

"[Elbrecht]: I don't recall.

"[Rule 32 counsel]: Okay. But if you're trying to show that the State didn't meet its burden of proof, wouldn't this have been helpful to show that there was no way they could link your client to the crime scene?

"[Elbrecht]: No, it would not.

"[Rule 32 counsel]: Why is that?

43

"[Elbrecht]: I don't know. That's just my opinion.

"[Rule 32 counsel]: Okay. So you're -- sitting here today, that's your opinion.

"Do you recall what your opinion was at the time?

"[Elbrecht]: We didn't offer this into evidence.

"[Rule 32 counsel]: And you don't know why?

"[Elbrecht]: 25 years ago."

(Evid. Hrg. Oct. 2018, R. 393-96.)

The circuit court denied Travis's blood-evidence claim and his footwear-impression-evidence claim, finding that "the record is silent as to Travis's counsel's reasons for not" introducing evidence that Haskew's blood was not found on Travis's clothing and for not introducing evidence that the footprints founds at the scene did not match Travis's shoes, and concluding that, "[w]here the record is unclear -- either because an issue was not addressed or because Travis's counsel could not recall -- this Court will presume that his counsel acted in a manner consistent with the 'counsel' that is guaranteed by the Sixth Amendment." (C. 4098-4100.) We agree with the circuit court.

This Court has explained that "'the presumption that counsel performed effectively "'is like the "presumption of innocence" in a

criminal trial,'" and the petitioner bears the burden of disproving that presumption. <u>Hunt v. State</u>, 940 So. 2d 1041, 1059 (Ala. Crim. App. 2005) (quoting <u>Chandler v. United States</u>, 218 F.3d 1305, 1314 n. 15 (11th Cir. 2000) (en banc)).'" <u>Reeves v. State</u>, 226 So. 3d 711, 748 (Ala. Crim. App. 2016) (quoting <u>Stallworth v. State</u>, 171 So. 3d 53, 92-93 (Ala. Crim. App. 2013)). A petitioner can overcome the presumption that counsel performed effectively by presenting "<u>evidence</u> to the contrary." <u>Reeves</u>, 226 So. 3d at 747. Here, although Travis's Rule 32 counsel asked Elbrecht about the blood evidence and the footwear-impression evidence, Elbrecht could not recall the specific reasons as to why they did not present that evidence due to the passage of time between preparing for Travis's trial and the Rule 32 evidentiary hearing -- approximately 25 years.

What is clear from trial counsels' testimony at the evidentiary hearing is that trial counsels' ultimate strategy was to hold the State to its burden of proof and "to keep as much of the evidence out as possible." (Evid. Hrg. Oct. 2018, R. 184.) Elbrecht explained that he wanted "to ensure that [the State] didn't get anything into evidence that would harm Mr. Travis." (Evid. Hrg. Oct. 2018, R. 184.) Travis failed to prove that

45

his counsels' decisions not to present footwear-impression evidence and blood evidence in order to create an inference that Travis did not enter Haskew's house was not a reasonable strategy under the circumstances of this case. Indeed, based on the record before this Court in Travis's direct appeal, Travis's trial counsels' decision not to present that evidence could have kept the State from presenting evidence that would have proved that Travis was, in fact, in Haskew's house at the time she was murdered.

For example, after he was apprehended by law enforcement, Travis waived his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and he provided a statement to Agent Simon Benson of the Alabama Bureau of Investigation and to other law-enforcement officers. (Record in CR-92-0958, C. 643-95.) Travis's statement was given to his trial counsel in discovery on December 19, 1992. (Record in CR-92-0958, C. 561.) In his statement to law enforcement, Travis admitted that he entered Haskew's house and that he was holding Haskew when Hall shot her. (Record in CR-92-0958, C. 561.) Leading up to his trial and during his trial, the State explained to Travis's counsel and to the trial court that it was not sure whether it would offer into evidence Travis's statement to law

46

enforcement. (See, e.g., Record in CR-92-0958, R. 2661-64.) Ultimately, the State did not offer Travis's statement at trial. But, if Travis's trial counsel had taken the course of action suggested by his Rule 32 counsel, the State could have rebutted the evidence inferring that Travis was not in Haskew's house with Travis's statement that he was, in fact, in Haskew's house at the time she was murdered. By avoiding the course of action Travis's Rule 32 counsel suggests, Travis's trial counsel was free to argue in his guilt-phase closing argument "that there's not one shred of direct evidence placing Wayne Travis in [Haskew's] house." (Record in CR-92-0958, R. 3103.)

In sum, Travis failed to prove that his counsels' decision not to present blood evidence and footwear-impression evidence at trial was not the result of a reasonable strategic decision. Thus, the circuit court did not err when it denied this claim.

### I.C.3.

Travis also argues that his counsel were ineffective because they failed to "fully investigate all potential theories of the defense." (Travis's brief, p. 57.) Travis argues that his counsel "claimed the defense strategy was to hold the State to its burden of proof or persuade the jury to convict

Travis of a lesser offense, like felony murder," but his counsel failed to "explain the lesser offenses to the jury." (Travis's brief, p. 58.) Travis says that his counsel should have argued the following theories:

"Capital Murder: A defendant cannot be convicted of complicity in an intentional murder based on his 'presence alone.' See Lauderdale v. State, 555 So. 2d 799, 801 (Ala. Crim. App. 1989) (discussing complicity theory of aiding murder). The Alabama Court of Criminal Appeals explained the complicity standard in Lauderdale, noting that evidence that a defendant was merely present at a murder (and even assisted after the fact) would support only an 'accessory after the fact' conviction, nothing more. Id. Likewise, the Court of Criminal Appeals emphasized that to convict of intentionally aiding a crime, 'the State must prove more than defendant's mere presence.' Wright v. State, 333 So. 2d 215, 216 (Ala. Crim. App. 1976). If there is no evidence of 'prearrangement or preconcert between persons charged with crime, the mere presence of one of them' is not enough. Id. Trial counsel did not effectively explain this standard to the jury and did not highlight the lack of evidence linking Travis to the murder.

"Felony Murder: It is a foundational principle of Alabama law that a defendant may not be convicted of intentional murder 'unless the jury believe, beyond a reasonable doubt, and to a moral certainty, he knew the murder was going to be committed before it was committed, and aided, abetted, or encouraged its commission.' Murphy v. State, 108 Ala. 10, 18 So. 557, 558 (1895). One defense theory that could have been presented to the jury was that Travis participated in a burglary but did not participate in the murder itself. However, counsel did not present this defense to the jury and were not familiar with the elements of felony murder. Indeed, at the Rule 32 hearing, Elbrecht did not know the elements of felony murder. (See H.R. at 986: 21-24 ('Q. Okay. And what is -- what do you have to negate, with

48

respect to a capital case, to get felony murder? A. I don't know.').)

"<u>Accomplice Liability</u>: The Alabama Court of Criminal Appeals explained the complicity standard in <u>Lauderdale</u>, noting that evidence that a defendant was merely present at a murder (and even assisted after the fact) would support only an 'accessory after the fact' conviction, nothing more. <u>Id.</u> Trial counsel knew that the State's entire case against Travis boiled down to circumstantial evidence showing that he was in the area of the victim's home the night of the crime and that he had been arrested the day after with the victim's car. Trial counsel did not present this evidence or the theory of accomplice liability to the jury. (R. 3387-88 (rejecting proposed jury instruction regarding Travis as Hall's accomplice and Hall's domination over Travis telling defense counsel, 'Y'all have chosen not to put that in issue').)"

(Travis's brief, pp. 58-59.)

In his fifth amended petition, Travis alleged that his trial counsel "had no coherent defense theory" and did not "properly explain to the jury the lesser-included offense of felony murder." (C. 2009.) Later in his petition, Travis claimed that his counsel were ineffective because they "failed to present a coherent theory of defense to the jury," and, in making that claim, Travis alleged:

"The law of capital murder and lesser-included offenses is complex. It was Defense Counsel's duty as an effective representative to explain to the jury the law of intent and felony murder, and to explain the deficiencies in the State's evidence of Mr. Travis's actions on the night of the crime in light of these laws."

49

(C. 2025-26.) The circuit court gave Travis an opportunity to prove this claim at an evidentiary hearing, and it gave him an opportunity to file a post-hearing brief to show how he had satisfied his burden of proof as to his allegations.

In his post-hearing brief, however, Travis added allegations about his counsels' failure to explain to the jury the interplay between felony murder, accomplice liability, and capital murder. Because Travis did not allege in his petition or in any of the five amendments to his petition that his counsel were ineffective for failing to explain to the jury accomplice liability and capital murder, those claims are not properly before this Court for appellate review. Thus, the only claim properly before this Court is Travis's argument that his counsel were ineffective for failing to explain to the jury the lesser-included offense of felony murder.

The circuit court, in its order denying this claim, found that Travis's claim was refuted by the record on direct appeal because, during the closing argument, his "counsel argued that the prosecution failed to prove beyond a reasonable doubt that he was guilty of capital murder and further argued that the jury, at most, should convict him of felony murder." (C. 4113.)

In challenging this judgment on appeal, Travis merely restates the argument he raised in his post-hearing brief and cites general propositions of law that, he says, hold that counsel has an obligation to investigate potential defense theories. Travis, however, does not mention the circuit court's findings as to this claim. Nor does Travis cite any authority showing how the circuit court's findings were incorrect. Thus, Travis's argument on appeal does not satisfy Rule 28(a)(10), Ala. R. App. P., and is deemed to be waived. See, e.g., Calhoun, 261 So. 3d at 472-73 (holding that Calhoun failed to "adequately argue" his claims on appeal because he "merely restate[d] these allegations from his petition," argued that the allegations in his petition showed that his counsel was ineffective and failed to cite "legal authority to support these contentions"). Even so, Travis's claim is without merit.

To the extent that Travis's claim focuses on his counsels' failure to present felony murder to the jury, as presented in his fifth amended petition, that claim, as the circuit court found, is clearly refuted by the record on direct appeal and, thus, is without merit. See, e.g., McNabb v. State, 991 So. 2d 313, 320 (Ala. Crim. App. 2007) (holding that a claim

that is clearly refuted by the record on direct appeal is without merit).

Indeed, during closing argument, Travis's trial counsel argued, in part:

> "[The district attorney] also told you that there are lesser included offenses. And, in this case, the Judge will charge you that there are lesser included offenses of intentional murder, felony murder and burglary in the first degree.
>
> "If you find Mr. Travis guilty of capital murder, we move into the second aspect of this trial. If you find him guilty of any of the lesser included offenses, your service is done. If you find him guilty of intentional murder, you service, in this case, is over. If you find him guilty of felony murder, your service, in this case, is over. You remember that scheme that was described to you by [the district attorney]. We are at stage one where you must make the decision of guilt or no guilt on capital murder, guilt or no guilt on the lesser included offenses.
>
> "Now, ladies and gentlemen of the jury, the Judge is going to charge you, in essence, and he's going to have a long charge and listen carefully to it. And it's our position that the evidence in this case does not rise to the level of capital murder. It does not rise to the level of capital murder. The Judge will charge you, in essence, that a Defendant who does not personally commit the act of killing, which constitutes the murder, that person can't be held responsible or guilty for capital murder unless he meets a certain complicity requirement.
>
> "Ladies and gentlemen, no one in this courtroom likes the loss of life. I don't. The Judge doesn't. You don't. But, you gave the State, the Judge and the Defendant your commitment, when this case started, that if they wouldn't prove it, beyond a reasonable doubt and to a moral certainty, you would not find [Travis] guilty of capital murder.

"Now I say to you, ladies and gentlemen of the jury, that there's not one shred of direct evidence placing Wayne Travis in that house. I say to you, ladies and gentlemen of the jury, there's not one shred of direct evidence putting Wayne Travis in possession of the pistol. I say to you, ladies and gentlemen of the jury, there's not one shred of direct evidence that he personally, personally, committed the act of killing Mrs. Haskew.

"There is circumstantial evidence. And the Judge is going to describe that to you. He'll define it for you under the law. And the State has already taken the position, in this case, that there's enough circumstantial evidence to convict of capital murder. And I say to you, ladies and gentlemen of the jury, that there's not enough evidence in this case to convict a human being of capital murder. There may be enough to convict someone of one of the lesser included offenses, but, not capital murder.

"... And I say to you that when you go back into that jury room, you need to go over all of the evidence and ask the question, was capital murder proved, beyond a reasonable doubt and to a moral certainty. And if it wasn't, you must acquit of capital murder.

"... And I further say to you, ladies and gentlemen of the jury, that the State did not meet its burden for the offense of capital murder."

(Record in CR-92-0958, R. 3100-06.) Clearly, Travis's trial counsel argued felony murder to the jury. Thus, Travis's claim to the contrary is without merit.

To the extent that Travis's claim focuses on the way his counsel presented the felony-murder argument to the jury, that claim is also

without merit. This Court has explained that "'[c]losing argument is an area where trial strategy is most evident,'" <u>Clark v. State</u>, 196 So. 3d 285, 315 (Ala. Crim. App. 2015) (quoting <u>Flemming v. State</u>, 949 S.W.2d 876, 881 (Tex. Ct. App. 1997), and that "'[m]atters of trial tactics and trial strategy are rarely interfered with or second-guessed on appeal.'" <u>Clark</u>, 196 So. 3d at 316 (quoting <u>Arthur v. State</u>, 711 So. 2d 1031, 1089 (Ala. Crim. App. 1996), aff'd, 711 So. 2d 1097 (Ala. 1997)). So, "'[w]ithout some explanation as to why counsel acted as he did, we presume that his actions were the product of an overall strategic plan.'" <u>Washington v. State</u>, 95 So. 3d 26, 54 (Ala. Crim. App. 2012) (quoting <u>Tong v. State</u>, 25 S.W.3d 707, 714 (Tex. Crim. App. 2000)).

During the evidentiary hearing on his Rule 32 petition, Travis asked Elbrecht the following:

> "[Travis's Rule 32 counsel]: Do you recall presenting to the jury that you wanted them to convict him, at most, of felony murder?
>
> "[Elbrecht]: I may have.
>
> "[Travis's Rule 32 counsel]: Okay. Let's look at that. That's R3101. So this is you speaking at closing argument.
>
> "'Okay. And you say, if you find him guilty of felony murder, your service in this case is over'; and then later on, you say, 'at most, the State has proved felony murder.'

"[Elbrecht]: Okay.

"[Travis's Rule 32 counsel]: Okay. And sitting here today, you don't recollect that being a conscious decision that you made?

"[Elbrecht]: I -- I just don't recall my final -- final arguments to the jury.

"[Travis's Rule 32 counsel]: Okay. Did you understand that with respect to felony murder, the difference is intent?

"[Elbrecht]: I thought I had written some notes about that. I thought I did.

"[Travis's Rule 32 counsel]: It's okay. So is it fair to say that whatever is in the record regarding --

"[Elbrecht]: What's in the record is in the record.

"[Travis's Rule 32 counsel]: Yeah. And whatever evidence you put in to try to demonstrate that there was a lack of intent here on the part of Mr. Travis is in the record?

"[Elbrecht]: Yeah. Whatever is in the record is in the record.

"[Travis's Rule 32 counsel]: And you don't remember anything specific that you were thinking about, in connection with the defense of this case, to try to affirmatively demonstrate there was a lack of intent?

"[Elbrecht]: It's been 25 years.

"[Travis's Rule 32 counsel]: I know. I have to ask the question.

"[Elbrecht]: Sure.

"[Travis's Rule 32 counsel]: Whatever you did is in the record?

"[Elbrecht]: Pretty much so. Yes, ma'am."

(Evid Hrg. Oct. 2018, R. 323-24.) So, although Travis asked Elbrecht general questions about the felony-murder argument he made to the jury and although Elbrecht said he could not remember the specific arguments he made, Travis did not ask Elbrecht any questions about why he did not "explain" -- as Travis puts it -- felony murder to the jury. "When a record is silent as to the reasons for an attorney's actions we must presume that counsel's conduct was reasonable." Hooks v. State, 21 So. 3d 772, 793 (Ala. Crim. App. 2008).

But, even if we agreed with Travis that Elbrecht should have explained in greater detail to the jury the concept of felony murder, Travis's claim still fails because he did not show how he was prejudiced by Elbrecht's failure to explain the offense of felony murder to the jury. Indeed, as set out above, Travis's trial counsel did tell the jury that, at most, Travis was guilty of felony murder. Although his trial counsel did not explain in detail the elements of felony murder, the circuit court provided that detail to the jury when it charged them on felony murder

as a lesser-included offense of capital murder. (Record in CR-92-0958, R. 3165-70.) "'Jurors are presumed to follow, not disregard, the trial court's instructions.'" DeBlase v. State, 294 So. 3d 154, 252 (Ala. Crim. App. 2018) (quoting Brooks v. State, 973 So. 2d 380, 409 (Ala. Crim. App. 2007)). In other words, despite trial counsels' failure to explain in greater detail the elements of felony murder, the jury was charged on that lesser-included offense and, thus, was well aware of what constitutes felony murder when it deliberated in Travis's case.

Because Travis failed to satisfy his burden of proof as to this claim, the circuit court did not err when it denied this claim.

### I.D.

Travis next argues that his trial counsel were ineffective because, he says, his counsel "failed to object to State theories and cross examine State witnesses." (Travis's brief, pp. 59-61.) The totality of Travis's argument on appeal is as follows:

> "During the State's opening and closing, the district attorney told the jury that Travis was a brutal killer who enjoyed the murder and the aftermath. The State's opening and closing were highly inflammatory, and painted Travis as a psychopath who 'had fun' murdering the victim and arranging the crime scene. (R. 3114.) The district attorney called the death a 'great celebration . . . Killed her on her birthday.' (R. 3115: 5-18.) He later remarked that Travis and

57

Hall 'had a big time while they did it. Had fun while they did it . . . Look at the pictures and see the destruction of the house. You can remember the video tape.' (R 3114: 14-19.) Lead counsel remained silent and did not object to any of this speculation, though the prejudicial nature of these statements is obvious.

"Similarly, during his closing argument at the guilt phase, the Assistant District Attorney invited the jury to speculate about what Travis was doing in the car the day after the crime. (R. 3085.) Despite the clearly objectionable nature of this invitation to speculate, defense counsel did not object. Nor did counsel ever object to, or rebut, the State's argument to the jury that Travis stole items from the victim's home -- despite the absence of any evidence of that fact. (R. 2814, 2973.) There was no physical evidence linking Travis to the interior of Ms. Haskew's house, nor was there any evidence of his footprints outside the house."

(Travis's brief, pp. 59-61.)

In his fifth amended petition, Travis alleged that his counsel were ineffective for failing "to protect [his] rights at trial" (C. 2023), in part, because, he said, his counsel failed "to object to the State's prejudicial remarks during argument," which included arguments in which the State "invited the jury to speculate about what Mr. Travis was doing in the car the day after the crime" and "classified the killing as a 'great celebration. Killed her on her birthday'" (C. 2024). The circuit court gave Travis an opportunity to prove this claim at the evidentiary hearing, and it gave

58

Travis an opportunity to file a post-hearing brief to show how he proved this claim at the hearing.

In his post-hearing brief, however, Travis modified his claim of ineffective assistance of counsel, alleging that his counsel were ineffective "because [they] failed to object to State Theories and Cross Examine State Witnesses." (C. 2499.) In addition to changing his claim of ineffective assistance of counsel in his post-hearing brief, Travis also added new factual allegations as to why his counsel were ineffective. (C. 2499-2500.) To the extent Travis raised a new claim of ineffective assistance of counsel in his post-hearing brief or adds new factual allegations to support the claim of ineffective assistance of counsel that he raised in his fifth amended petition, that new claim and those new factual allegations are not properly before this Court for appellate review. To the extent that Travis argues on appeal that the circuit court erred when it denied the claim he raised in his fifth amended petition regarding prejudicial remarks by the State during opening and closing arguments, Travis's argument does not satisfy Rule 28(a)(10), Ala. R. App. P.

Rule 28(a)(10), Ala. R. App. P., requires, in relevant part, that an argument in a brief include "the contentions of the appellant/petitioner

with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Although Travis reasserts the allegations he raised in his fifth amended petition, Travis makes no argument on appeal as to why the circuit court's denial of this claim was incorrect. Nor does he cite any authority to support his contention that the remarks were improper or prejudicial. "This Court has held that similar failures of argument do not comply with Rule 28(a)(10), Ala. R. App. P., and constitute a waiver of the underlying postconviction claim. See, e.g., Morris v. State, 261 So. 3d 1181 (Ala. Crim. App. 2016); Bryant v. State, 181 So. 3d 1087, 1118-19 (Ala. Crim. App. 2011); and Taylor v. State, 157 So. 3d 131, 142-45 (Ala. Crim. App. 2010)." Woodward v. State, 276 So. 3d 713, 746 (Ala. Crim. App. 2018). Accordingly, Travis is not entitled to any relief on this claim.

## I.E.

Travis argues that his "trial counsel were ineffective because they failed to address the issue of satanism." (Travis's brief, pp. 61-63.) According to Travis, his trial counsel filed a motion in limine to exclude references to Satanism at Travis's trial and the trial court granted that

motion but "allowed an inflammatory and prejudicial graphic picture and video of the pentagram and 'Thunderstruck' paintings to be shown to the jury because trial counsel failed to show that either was related to Satanism." (Travis's brief, p. 61.) Travis further contends that, if his counsel had reviewed the handwritten "Satanic bible" the State had provided counsel in discovery, counsel "would have been able to make a clear showing that the 'geometric shape' in question was in fact a widely-recognized Satanic symbol." (Travis's brief, pp. 61-62.) Travis says that, if his counsel had known this information, "they might have convinced the trial court that these pictures and the video contained inflammatory symbols of Satanism," and the pictures and video "may have been excluded," or they could have "preserve[d] the issue for appeal by presenting the evidence linking the pentagram to Satanism and asking the trial court for a ruling." (Travis's brief, p. 62.) Travis did not raise this specific claim of ineffective assistance of counsel in his Rule 32 petition or in any of the five amendments to his petition. Rather, Travis presented this claim to the circuit court for the first time in his post-hearing brief, and, what is more, he never obtained an adverse ruling on

this claim. Consequently, as explained above, Travis's argument on appeal is not properly before this Court.

I.F.

Travis next argues that his "trial counsel were ineffective in the guilt phase closing argument." (Travis's brief, pp. 63-66.) According to Travis, his counsels' closing argument was deficient because "it completely ignored Hall," "even though evidence existed that could have been marshalled to explain to the jury that Hall had committed the murder and acted alone"; it "did not define" for the jury the lesser-included offenses of intentional murder, felony murder, or first-degree burglary or "explain the State's burden to prove all elements of these offenses"; it "failed to provide a framework for the jury to use to analyze these different alternative theories of liability as compared to the evidence that had been presented at trial"; it "praise[d] the prosecutor"; and it was used to "distance [counsel] from Travis." (Travis's brief, pp. 64-65.)

In his fifth amended petition, Travis alleged that his counsel were ineffective because they "failed to present a coherent theory of defense to the jury." (C. 2025.) In making this allegation, Travis claimed that his

counsels' closing argument "made no mention of the alternative view that Steven Hall alone shot and killed Clarene Haskew, with no aid from Mr. Travis"; "failed to explain to the jury that the prosecution was relying solely on circumstantial evidence"; did not "explain felony murder to the jury"; "failed to demonstrate to the jury that the State did not present sufficient evidence to prove intent to kill, an essential element of first degree murder"; "failed to make an effective presentation of a defense theory to the jury"; "failed to challenge the State's version of the sequence of events and to adequately explain the State's failure to in any way prove the necessary elements of first degree murder, particularly and intent to kill"; and "failed to provide the jury with a framework for understanding how the State's evidence was wholly insufficient to convict Mr. Travis of murder." (C. 2026-27.) The circuit court gave Travis an opportunity to prove this claim of ineffective assistance of counsel at the evidentiary hearing, and it gave him an opportunity to file a post-hearing brief to show how he proved this claim.

In his post-hearing brief, however, Travis modified the claim he raised in his fifth amended petition, arguing that his counsel were ineffective "in his guilt phase closing statement." (C. 2502-05.) In

making this modified claim, Travis realleged that his counsel failed to argue to the jury that Hall had acted alone and failed to explain felony murder. (C. 2503-04.) Travis also added new factual allegations that his counsel failed to explain intentional murder and first-degree burglary, used the closing argument to "praise the prosecutor," and used the closing argument to "distance himself from Mr. Travis." (C. 2504-05.)

The new factual allegations that Travis raised in his post-hearing brief as to his counsels' effectiveness during the closing argument are not properly before this Court because they were not included in either Travis's Rule 32 petition or in any of the five amendments to his petition, and they will not be considered. See Bryant, 181 So. 3d at 1108 ("We note that Bryant alleges additional, and more specific, facts in his brief on appeal regarding this claim. However, these factual allegations were not included in his petition or amended petition; therefore, they are not properly before this Court for review and will not be considered.").

To the extent that Travis argues on appeal that the circuit court erred when it denied the claim he raised in his fifth amended petition, Travis's argument is without merit.

First, Travis's argument that his counsel were ineffective during the closing argument because they failed to explain felony murder is, as explained in Part I.C.3. of this opinion, without merit because Travis failed to ask his trial counsel any questions during the evidentiary hearing as to why he did not explain to the jury the law of felony murder in greater detail. Because "[w]hen a record is silent as to the reasons for an attorney's actions we must presume that counsel's conduct was reasonable" Hooks, 21 So. 3d at 793, we conclude that Travis's counsels' performance was reasonable. Regardless, as explained in Part I.C.3. of this opinion, Travis's claim fails because he did not show how he was prejudiced by his counsels' failure to explain to the jury in greater detail the law of felony murder. Indeed, as set out above, Travis's trial counsel did tell the jury that, at most, Travis was guilty of felony murder. Although his trial counsel did not explain in detail the elements of felony murder, the circuit court provided that detail to the jury when it charged the jury on felony murder as a lesser-included offense of capital murder. (Record in CR-92-0958, R. 3165-70.) In other words, despite trial counsel's failure to explain in greater detail the elements of felony murder, the jury was well aware of what constitutes felony murder and

Travis's counsel argued to the jury that, at most, felony murder, not capital murder, was an appropriate verdict when it deliberated in this case.

As to Travis's claim that his counsel were ineffective for failing to mention Hall in the closing argument, that claim is also without merit because, although he asked his trial counsel questions about the State's theory that Hall and Travis acted in concert when Haskew was murdered (see, e.g., Evid. Hrg. Oct. 2018, R. 322), Travis did not ask his trial counsel any questions about his reasoning as to why he did not mention Hall (or posit the theory that Hall had acted alone) during the closing argument. Again, "'[i]f the record is silent as to the reasoning behind counsel's actions, the presumption of effectiveness is sufficient to deny relief on [an] ineffective assistance of counsel claim.'" Davis v. State, 9 So. 3d 539, 546 (Ala. Crim. App. 2008) (quoting Howard v. State, 239 S.W.3d 359, 367 (Tex. Crim. App. 2007)).

Accordingly, the circuit court did not err when it denied Travis's claim of ineffective assistance of counsel.

## I.G.

Finally, Travis argues that "a reasonable probability exists that [he] would not have been convicted of capital murder had trial counsel performed effectively." (Travis's brief, pp. 66-70.) According to Travis, his counsels' "lack of preparation, effort, and investigation made it impossible for them to make strategic decisions as to how to present Travis's case during the guilt phase" and his counsel "could have used the evidence available to argue that, at the time Hall committed the crime, Travis was attempting to hotwire a car." (Travis's brief, p. 66.) Travis further argues that a "reasonable investigation and review would have allowed trial counsel to demonstrate that the only evidence against Travis in this case was that he was present <u>near</u> the crime scene -- which is not enough to convict him of capital murder on a complicity theory." (Travis's brief, pp. 66-67.) Travis also argues that his counsel failed to investigate and consider evidence that linked Hall "to the vandalism around the murder scene, the evidence distancing Travis from the murder weapon, and the lack of evidence linking Travis to the scene, it is likely that the result of the trial would have been different." (Travis's brief, p. 67.)

In his fifth amended petition, Travis alleged that his counsels' "deficient performance during the guilt stage prejudiced [him] and violated his constitutional rights." (C. 2026.) The totality of Travis's claim in his petition was as follows:

"Defense Counsel's inadequate and insufficient performance was prejudicial to Mr. Travis's right to a fair trial and a reliable verdict. Had they performed their duties as was constitutionally required, there is a reasonable likelihood that Mr. Travis would not have been convicted of capital murder and would likely not have been convicted at all. Alternatively, at most, Mr. Travis would have been convicted of felony murder, a crime for which the death penalty is not available. Defense Counsel's failure to develop an affirmative defense strategy and present a coherent defense confused the jury. Defense Counsel failed to show that the State utterly lacked physical evidence of Mr. Travis's involvement in the murder and that the State was incapable of showing what actually went on in the victim's home on the night of the crime. An effective presentation about the gaps in the State's evidence would have created a reasonable doubt as to whether Mr. Travis was guilty of capital murder and/or whether Mr. Travis should have been convicted of a lesser offense."

(C. 2026-27.) The circuit court gave Travis an opportunity to prove this claim at an evidentiary hearing, and it gave Travis the opportunity to file a post-hearing brief to explain how he proved this claim.

In his post-hearing brief, however, Travis modified his guilt-phase cumulative-effect claim, arguing that "[a] reasonable probability exists that Travis would not have been convicted of capital murder had trial

counsel performed effectively." (C. 2505.) In modifying his claim, Travis added new factual allegations as to why, he says, his counsels' guilt-phase performance prejudiced him, including their "lack of preparation, effort, and investigation" and their failure to use "the evidence available to them to argue that, at the time Hall committed the crime, Mr. Travis was attempting to hotwire a car using the screwdriver he had, as corroborated by the damage found to the steering column of Ms. Haskew's pickup truck." (C. 2505.)

The circuit court denied the claim raised in Travis's fifth amended petition, finding that "a Rule 32 circuit court is not required to consider the cumulative effect of claims of ineffective assistance of counsel" and, alternatively, it had "thoroughly reviewed each of Travis's ineffective-assistance claims and concluded they are without merit." (C. 4114-15.)

To the extent that Travis raised new factual allegations in his post-hearing brief to support the cumulative-effect claim that he alleged in his fifth amended petition, those new factual allegations are not properly before this Court because they were not included in either Travis's Rule 32 petition or in any of the five amendments to his petition. See Bryant, 181 So. 3d at 1108 ("We note that Bryant alleges additional, and more

specific, facts in his brief on appeal regarding this claim. However, these factual allegations were not included in his petition or amended petition; therefore, they are not properly before this Court for review and will not be considered.").

To the extent that Travis reasserts on appeal the cumulative-effect claim that he raised in his fifth amended petition, that claim is without merit. As the circuit court correctly recognized in its order denying Travis's claim:

> "'Alabama does not recognize a "cumulative effect" analysis for ineffective-assistance-of-counsel claims.' Carruth v. State, 165 So. 3d 627, 651 (Ala. Crim. App. 2014). We have repeatedly declined similar requests from petitioners to do so. See, e.g., Mashburn v. State, 148 So. 3d 1094, 1118 (Ala. Crim. App. 2013); Washington, 95 So. 3d at 58. And because [Travis] has shown no deficient performance [as to his guilt-phase claims of ineffective assistance of counsel], there is no opportunity for this Court to engage in a cumulative-effect analysis."

Lewis v. State, 333 So. 3d 970, 1016 (Ala. Crim. App. 2020) (opinion on return to remand).

To the extent that Travis argues that his counsel were ineffective because they failed to undertake a reasonable investigation and review of the evidence that would show that Hall acted alone and that distanced Travis from the crime scene and to the extent that claim was raised in

70

Travis's fifth amended petition, Travis's argument is without merit. This Court has explained:

> "'The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.'
>
> "Strickland, 466 U.S. at 691."

Washington v. State, 95 So. 3d 26, 52 (Ala. Crim. App. 2012).

At the evidentiary hearing, Travis called one of his trial counsel, Robert King, to testify about his role in Travis's case. During the State's cross-examination of King, the State asked him whether Travis had made inculpatory statements to him. (Evid. Hrg. Oct 2018, R. 561.) King responded as follows:

> "He gave statements that indicated he may have -- that may be inculpatory at least to some crimes. Okay? I mean. I'll put it that way.
>
> "I think -- again, I mean, I'm -- y'all are talking about the legal issue. I'm talking about the ethical issue. So I don't want to say something I'm not supposed to say. I believe I can say -- because I think this is what I told y'all -- everything that [Travis] told us that would have given us a credible argument to fight the charges was developed in the trial.

71

"So if you see something in the transcript that we 're arguing about -- for example, who is the person who fired the gun? Okay. We questioned witnesses about that, tried to introduce evidence about that. If he had given other exculpatory things that we could have raised, we would have raised them. Okay? So I don't really want to say specifically, yes, he said this, yes, he said that. But, I mean, if it's not in that transcript, then we had no -- not just from [Travis]. We had no basis from anything to argue that he was in Georgia, for example, or, you know, he was passed out in the car somewhere or any of those kinds of things.

"Again, if there had been, we would have pursued them, possibly by having him testify. But even without that, by trying to introduce evidence through other witnesses, the issues regarding -- you know, some things are still clear even 25 years ago. Simon Benson, the investigator in this case, made statements to us that not only -- you know, that he believed Mr. Hall was the shooter. We tried to get that into evidence. The judge wouldn't let it into evidence. He made statements to us that he saw one of these two -- and it wasn't Mr. Travis -- draw a pentagram, I think it was, one of the Satanic symbols during a statement. We tried to question him about those things.

"There was nothing provided by Mr. Travis or in our investigation that gave us anything to argue about to try to rebut the State's case except what we offered at trial. I mean, I'm not trying to avoid your question. But I think that answers it without me having to say specifically what he said."

(Evid. Hrg. Oct. 2018, R. 562-65.) Thereafter, the following exchange occurred:

72

"[The State]: Well, I'm going to ask the specific question anyway.

"[King]: Okay.  If the judge tells me I can say it, it's fine. I mean --

"[The State]: Wayne admitted to you his presence inside the house, didn't he?

"....

"[King]: The answer is, yes.  It's also in the statements given to Mr. McGraw, that y'all already have in evidence.

"[The State]: And, in fact, he also told the same thing to Dr. Atkins; is that correct?

"[King]: That's my -- I was not there when he was interviewed by Dr. Atkins, but that's my understanding from Dr. Atkins'[s] report.

"....

"[The State]: … Did Mr. Travis tell Dr. Atkins that they should have dumped the body in the river because no body, no crime?

"[King]: Again, I was not present when Mr. Travis met with Dr. Atkins.  Dr. Atkins told me that Mr. Travis said that to him --"

(Evid. Hrg. Oct. 2018, R. 565-66.)

In other words, although Travis's Rule 32 counsel alleged that his trial counsel were ineffective for failing to investigate and review evidence that would distance Travis from the crime scene and show that

Hall acted alone, Travis's trial counsel were told by Travis that he was inside Haskew's house. Additionally, Travis's trial counsel were aware that Travis told law enforcement that he was in Haskew's house. What is more, Travis's counsel were told by Dr. Atkins that Travis had expressed to him that he was inside the house and had expressed regret that he and Hall did not dispose of Haskew's body. Based on Travis's own statements to his counsel, to law enforcement, and to Dr. Atkins, Travis's trial counsels' approach during the guilt phase of his trial to hold the State to its burden of proving that Travis was guilty of capital murder when there was no direct evidence that Travis killed Haskew was reasonable.

Accordingly, Travis is not entitled to any relief on this claim.

II. Penalty-Phase Claims of Ineffective Assistance of Counsel

Travis also argues that his counsel were ineffective during the penalty phase of his trial. Because Travis's penalty-phase claims of ineffective assistance of counsel include allegations that his counsel failed to adequately prepare a mitigation case and failed to present certain mitigating evidence, we first set out what evidence his trial counsel presented during the penalty phase of his trial.

During the penalty phase of his trial, Travis's counsel called 12 witnesses to testify as to mitigation: Cary Travis, Chestine Findley, Marian Travis, Phyllis Davis, Wayne Stovall, Lorraine Stovall, Gary Dailey, Jeff Bottom, Tim Carter, Tommy Bridges, Wanda Lou Caldwell, and Lisa Bartlett. Travis's trial counsel also submitted, by stipulation, a portion of Dr. Patrick Bruce Atkins's report that showed that Travis had as an "Axis I" diagnosis of "a mental illness in the form of polysubstance dependency with gasoline inhalation and marijuana abuse and previous history of using other substances, such as amphetamines, barbiturates, and acid in the past," and that, because of Travis's "extensive history of child abuse in the past," that Travis "may likely have post-traumatic stress disorder"; an "Axis II" diagnosis of "anti-social personality disorder"; and an "Axis III" diagnosis that he could not "exclude an organic mental disorder, secondary to chronic inhalation of gasoline" and noted that "more formal neuropsychological testing may be beneficial" and that "an MRI of the brain may be of benefit in determining whether or not there is any underlying organic brain damage." (Record in CR-92-0958, C. 1272.)

The testimony of these 12 witnesses tended to show the following: Cary and his wife, Marion Travis, adopted Travis in 1976 when Travis was six years old and they did not know anything about Travis's upbringing before they adopted him. (Record in CR-92-0958, R. 3229-32.) Cary said that they did not know that Travis had biological sisters, but Travis had talked about them and had told them that he was promised that he would be able to stay with his sisters. (Record in CR-92-0958, R. 3234.) Cary said that Travis was not stable when he came into their house and that he was "emotionally disturbed because he had been separated from his family, his sisters." (Record in CR-92-0958, R. 3235.) Cary said that the Department of Human Resources ("DHR") told them that Travis could not have contact with his biological family. (Record in CR-92-0958, R. 3235.) Cary also said that Travis had difficulty sleeping and refused to sleep in his own room; instead, Travis would only sleep on a "roll-a-way" bed at the foot of Cary and Marion's bed and Travis slept on that bed for four years. (Record in CR-92-0958, R. 3236-37.) Cary said that Travis also wet the bed and was on medication to help prevent bed wetting, but Marion (who was a registered nurse) helped Travis alleviate

the bed-wetting problem without having to rely on the medication. (Record in CR-92-0958, R. 3237, 3259.)

Cary said that they did not learn about what happened in Travis's upbringing before he was adopted until Travis was about 10 years old. (Record in CR-92-0958, R. 3238.) Around that time, Travis went to undergo a mental-health evaluation and he went to "St. Mary's home ... and stayed a period of time." (Record in CR-92-0958, R. 3239.) Cary said that Travis talked to him once about his early childhood and about how he was attached to his biological sisters and that he did not understand why Cary and Marian had not adopted his siblings. Cary said that Travis "talked about numerous situations in the family where the mother had been beaten about the face, blood coming down her face, wearing a leather jacket." (Record in CR-92-0958, R. 3240.) Marian said that she "couldn't help but love [Travis]." (Record in CR-92-0958, R. 3263.) Marian also said that she did not view Travis as a violent person and that she was not afraid of him. (Record in CR-92-0958, R. 3266-67.)

Chestine Findley, a child-welfare worker for DHR, helped finalize Travis's adoption and helped with Travis after the adoption "[b]ecause there [were] some problems." (Record in CR-92-0958, R. 3247.) Findley

said that, after the adoption, Travis had some emotional difficulties and that she tried to help Cary, Marion, and Travis by placing Travis in St. Mary's home where he could receive psychological counseling. (Record in CR-92-0958, R. 3248.) Findley said that they also placed Travis in the Eufaula Adolescent Adjustment Center. (Record in CR-92-0958, R. 3249.) In her view, Travis's adoption was an "adoption that went bad." (Record in CR-92-0958, R. 3249.) Findley said that Travis had an emotionally troubled childhood. (Record in CR-92-0958, R. 3254.)

Phyllis Davis, who was Travis's first-grade teacher and who drove Travis to school on occasion, explained that she knew from Cary and Marion that Travis came from a "broken home," and she surmised that Travis would have emotional-stability issues. (Record in CR-92-0958, R. 3270.) Davis explained that Travis had a hard time sitting still and that, at times, "he would have outbursts of reaction to a situation that [she] did not consider to be normal." (Record in CR-92-0958, R. 3270.) Travis struggled in school and "started in the first grade with about a C-D average and progressed relatively downward through the fifth grade to where he was making a lot more D's and F's." (Record in CR-92-0958, R. 3337.) Davis said that, sometimes, Travis would come home with her

after school and that he "absolutely adored [her] daughter" and that Travis and her daughter "bonded." (Record in CR-92-0958, R. 3272.) Davis said that she thought that Travis "loved" them and they, "in turn, loved him." (Record in CR-92-0958, R. 3272.) Davis said that the Travises are good people. (Record in CR-92-0958, R. 3272.)

Wayne Stovall and Lorraine Stovall, who served as foster parents to Travis and his biological sisters before Travis was adopted, testified that Tim Carter, a DHR worker, brought Travis and his sisters to them and that the children "were in poor condition." (Record in CR-92-0958, R. 3281.) Wayne said that the children had a lot of "bruises, lot of mental problems, anxious, untrustworthy." (Record in CR-92-0958, R. 3281.) Lorraine said that the children had numerous signs of physical abuse, including bruises and scars. (Record in CR-92-0958, R. 3286.) Wayne also said that the children said that they had been "neglected by their mother," that their mother would lock them "in cars while [she] went inside bars," and that they had "witnessed shootings, beatings." (Record in CR-92-0958, R. 3281-82.) Wayne said that Travis was five years old when he came to their house, but he did not act like a normal five-year-old. Specifically, Wayne said that Travis was "very distrustful"; he "was

79

afraid of people, afraid of what might happen to him, addicted to sugar, constantly wet his pants and the bed, nosebleeds." (Record in CR-92-0958, R. 3282.) Wayne said that Travis was able to ride a bicycle "better than a ten year old" and that he was "capable, but he was just -- just neglected; he was left to fend for himself." (Record in CR-92-0958, R. 3282.)

Lorraine explained that, after six weeks, Travis's sisters were taken to a different foster home, and she explained that "it was emotional, very emotional." (Record in CR-92-0958, R. 3288.) But they were told that DHR was "going to try to keep [the sisters] close." (Record in CR-92-0958, R. 3288.) In total, Travis lived with the Stovalls for about 18 months. (Record in CR-92-0958, R. 3288.)

Gary Dailey, a law-enforcement officer with the Limestone County Sheriff's Department, testified that he knew Travis's biological mother, Myrtle Bartlett, and that he "got in an incident where [he] had a shoot-out with a gentleman [Jackie Crabtree] that was dating her." (Record in CR-92-0958, R. 3292.) Dailey said that Crabtree was killed during that altercation. (Record in CR-92-0958, R. 3293.) Dailey said that Crabtree was a violent man. (Record in CR-92-0958, R. 3294.)

Jeff Bottom, a former law enforcement officer with the Limestone County Sheriff's Department, said that he first encountered Travis's biological family when he worked at his family's store in Ardmore. (Record in CR-9958, R. 3297.) Bottom said that, when he worked as a police officer, he recalled "human services" calls that involved Travis's biological family -- specifically, Bottom recalled a time when Travis's biological mother left her children alone in the backseat of a car while she went into a tavern. (Record in CR-92-0958, R. 3297.)

Tim Carter, a social worker with DHR, said that he did an extensive report on Travis's biological family, which served as a catalyst for removing Travis and his sisters from their biological mother. (Record in CR-92-0958, R. 3300.) Carter said that they learned of the issues with Travis's biological family from "complaints from the community." (Record in CR-92-0958, R. 3312.) According to Carter, there were concerns about the children being exposed to fighting and drunken parties in the home. (Record in CR-92-0958, R. 3312.) There were also concerns that the eldest daughter -- who was 15 years old at the time -- at the behest of Travis's biological mother "was providing sexual services to different men that came to the home." (Record in CR-92-0958, R.

3312.) In December 1970, DHR received a report that Travis's biological parents were subjecting their children to "moral and physical neglect." (Record in CR-92-0958, R. 3313.) Carter said that DHR had observed the children looking "dirty and appearing malnourished." (Record in CR-92-0958, R. 3314.) Carter said that Travis's biological parents had been arrested for public drunkenness and for driving while intoxicated, and that law enforcement had been called out to their home "periodically to break up fights and parties involving several drunks." (Record in CR-92-0958, R. 3314.) Carter said that Travis's childhood home was "in bad condition" and that there were reports that Travis's biological mother would leave the children at home alone while she and Crabtree would ride around drunk. (Record in CR-92-0958, R. 3315.) Carter said that there were also reports that Travis's biological mother would leave the children unattended for days at a time, and that she allowed her 13-year-old daughter to date older men. (Record in CR-92-0958, R. 3316.) Carter testified that, at some point, he went to visit the home and found the family "residing in a burned out shell of a building which had served as a small school building in the past." (Record in CR-92-0958, R. 3317.) Carter said that later he visited Travis's sister in the hospital after she

suffered burns from having "thrown a jug of kerosene in the fire and an explosion had caused some burns." (Record in CR-92-0958, R. 3317.) Carter further testified that the children -- including Travis -- had witnessed their mother being raped and that they had been subjected to physical violence. (Record in CR-92-0958, R. 3319.) The children were also left unattended in a car for three hours when the temperatures were in the 90s while their biological mother was inside a tavern. (Record in CR-92-0958, R. 3320.) At that point, the children were removed from their biological mother and placed into foster care. (Record in CR-92-0958, R. 3320.) Carter said that Travis's biological home was one of the worst he had seen in his career. (Record in CR-92-0958, R. 3329-30.)

Wanda Lou Caldwell, Travis's biological sister, said that she last saw Travis "about three weeks after they were taken away" from their mother and that, at that time, Travis "was approximately four years old." (Record in CR-92-0958, R. 3349.) Caldwell said that she was 16 or 17 years old the last time she saw Travis. (Record in CR-92-0958, R. 3350.) Caldwell said that her father

> "was an alcoholic, still is an alcoholic. And we survived the best way we could. We had power maybe one month out of a year. And my dad would have these men come in to have

83

parties with him and he would try to get my mother to get money from them to turn our power on."

(Record in CR-92-0958, R. 3351-52.)  Caldwell said that she got a job when she turned 13 years old, but she did not leave the house because Travis "was just a little bitty baby and [she] had three sisters.  And [she] was afraid to leave them."  (Record in CR-92-0958, R. 3352.)  Caldwell said that her mother and father separated, and her mother started dating Jackie Crabtree.  Caldwell said of Crabtree:

> "There wasn't but one of us that he didn't beat.  He claimed that [Travis] was his favorite and the way he showed him he would -- when we got up in the morning we had an[] old wood heater and he would grab [Travis] up and he would tickle until he cried and he would either mess his britches or something and Jackie would grab him by the arm and sling him around and whip him.  And we didn't have running water.  And we had a goat that had this big tub that he drank out of and it would be ice on it and that's where [Travis] was put."

(Record in CR-92-0958, R. 3353-54.)  Caldwell said that, regardless of the time of year, "a little pair of girls panties is all that [Travis] wore." (Record in CR-92-0958, R. 3354.)  Caldwell said that they had no inside bathroom, no indoor plumbing, and no electricity where they lived.

Caldwell also explained that there was violence in the home every night.  She said that either her mother and Crabtree would fight or "if [Crabtree] wasn't hitting [her] mother, he was hitting [Caldwell] and

84

[Travis] was trying to pull him off and he would take and throw him up against the wall." (Record in CR-92-0958, R. 3355.)

In addition to the violence in their home, Caldwell explained that the children witnessed deviant sexual activity. For example, Caldwell explained that Crabtree's uncles lived next to them and between the two houses

> "there was a little pen ... and it was this goat they kept in it. And every time he would get drunk he would go out there and he would get that goat and he would put it on the well house and he would have sex with that goat where we would see it."

(Record in CR-92-0958, R. 3358.) Caldwell also said that Travis witnessed one of the uncles attempt to have sex with a chicken. (Record in CR-92-0958, R. 3360.)

Caldwell said that her mother and Crabtree would leave the children alone and that she would take her siblings "to the Red Barn and feed them." (Record in CR-92-0958, R. 3360.) Caldwell said that they "dug in the dumpster in Huntsville behind Krispy Kreme and ate donuts because they were hungry." (Record in CR-92-0958, R. 3361.)

Lisa Bartlett, another one of Travis's biological sisters, also discussed Travis's early childhood. Bartlett explained that Crabtree

"mistreated all of us, more especially [Travis]."  (Record in CR-92-0958, R. 3366.)  Bartlett said:

> "There was unbearable spankings, beatings.  There was, all the time, parties going on, shootings.  This man that my mother lived with, alcoholic, drank every day, spent his money on -- every dime, just to get a drink.  There were time when [Travis] was just a baby, [Travis] would wet his pants like a child does.  And punishment was put him in a cold tub, even if it was winter time and set him outside.  There was times when the parties were being thrown if we -- if we kids were to be seen, you know, we were supposed to be out of sight.  If we weren't being watched, didn't matter.  Be out of sight.  Don't be around us, we're having a party.  There was times if we didn't listen we were pushed under the bed with a broom handle, beat with a broom handle."

(Record in CR-92-0958, R. 3366.)  Bartlett said that, when they were removed from their home, Tim Carter -- the social worker -- told them that they were going to keep the siblings together, but "they took [Travis] away from us."  (Record in CR-92-0958, R. 3367-68.)

After hearing this testimony and weighing the aggravating and mitigating circumstances, the jury, by a vote of 11 to 1, recommended that Travis be sentenced to death.  (Record in CR-92-0958, C. 374.)

Mindful of this context, we now turn to Travis's penalty-phase claims of ineffective assistance of counsel.

## II.A.

Travis argues that his trial counsel were ineffective during the penalty phase of his trial because they "failed to adequately investigate and prepare for the penalty phase, and thus failed to make a compelling mitigation case." (Travis's brief, pp. 72-89.) Specifically, Travis claims that his counsel were ineffective because they "failed to obtain a timely psychological evaluation" (Travis's brief, p. 73); they "presented a contradictory and confused mitigation case" (Travis's brief, p. 78); and they "fail[ed] to obtain a mitigation expert" (Travis's brief, p. 85). We address each argument in turn.

## II.A.1.

Travis first argues that his counsel were ineffective because they "failed to obtain a timely psychological evaluation." (Travis's brief, p. 73.) According to Travis, although the trial court granted his trial counsel funds to have him undergo a psychiatric evaluation in April 1992, Travis's trial counsel "inexplicably did not have the psychiatric examination performed on Travis until February 3, 1993, ... just weeks before trial." (Travis's brief, p. 74.) Travis says that this "delay proved costly" because Dr. Atkins recommended that Travis "be examined further to identify whether he suffered from 'organic brain damage' and

ordered an MRI of Travis's brain" and "trial counsel's failure to act timely left them unable to implement the psychiatrist's recommendations." (Travis's brief, p. 74.)

In his fifth amended petition, Travis alleged that his counsel were ineffective for "failing to procure necessary psychological and neuropsychological expert assistance." (C. 2015.) In making this allegation, Travis raised three specific claims: (1) that his trial counsel "failed to obtain a full psychiatric evaluation of [him] prior to trial even though they were expressly directed by the trial court to have one completed" (C. 2015 (emphasis omitted)); (2) that his trial counsel "failed to present effectively even the limited results of Dr. Atkins'[s] examination by failing to call him to testify at trial" (C. 2016); and (3) that his trial counsel "failed to pursue neuropsychological testing necessary to Mr. Travis's defense" and that "Dr. Atkins'[s] report served to place counsel on notice of potentially material defense claims pertaining to Mr. Travis's culpability." (C. 2017-18.) The circuit court gave Travis an opportunity to prove all three allegations at an evidentiary hearing, and, after the hearing, it denied each claim.

Specifically, the circuit court found that Travis's claim that his trial counsel failed to have Travis undergo a psychiatric evaluation was clearly refuted by the record on direct appeal (C. 4085-86); that Travis's claim that his trial counsel failed to present the results of Dr. Atkins's evaluation was without merit (C. 4086-91); and that Travis's claim that his trial counsel failed to obtain neuropsychological testing was without merit. (C. 4091-94.)

Travis's argument on appeal appears to concern only the circuit court's denial of his third claim -- i.e., that his counsel were ineffective for failing to obtain neuropsychological testing. In finding that claim to be without merit, the circuit court explained, in part:

> "Travis called Dr. Michael Brook, a neuropsychologist, in an attempt to support this claim. In rebuttal, the State called Dr. Glen King, an expert in clinical and forensic psychology with significant expertise and experience in neuropsychological assessments. This Court had the opportunity to observe Drs. Brook and King when they testified and listened carefully to their testimony. For the following reasons, this Court credits the testimony of Dr. King and accordingly denies Travis's claim.
>
> "Although the Court credits Dr. King's testimony, the Court does credit Dr. Brook's testimony in limited part. First, the Court credits his testimony that his neuropsychological assessment of Travis reveals that his cognitive functions were within normal limits or above compared to other people of his demographic background, with the exception that he does not

89

learn and recall information as efficiently as other people his age. Second, this Court credits his testimony that Travis's brain MRI images were normal.

"This Court now will resolve the points of contention between Drs. Brook and King.

"First, this Court finds that Travis generated an invalid profile on the versions of the MMPI that Drs. Brook and King administered to him, and this Court credits Dr. King's testimony that Travis's performance on those test instruments reveals that he was exaggerating mental-health symptoms and faked the results.

"Dr. Brook refused to concede as much, even though Travis generated an invalid profile on the MMPI that he administered 'due to atypically high endorsement of infrequent responses that are uncommon even in individuals with genuine severe psychopathology.' On one hand, Dr. Brook essentially disregarded the results of the MMPI because it was invalid. The Court finds that Dr. Brook stretched to conclude that Travis answered that questionnaire truthfully. He was able to reach that opinion only by looking at some of the symptoms that Travis endorsed and finding that he endorsed them 'simply due to [the] unique circumstances he's in as opposed to exaggerating or malingering.' Dr. King categorically rejected that approach. This Court credits Dr. King's testimony that Travis was exaggerating mental health symptoms and faked the results on the versions of the MMPI that he and Dr. Brook administered to him.

"Second, perhaps the primary dispute between Drs. King and Brook is whether Travis qualifies for a diagnosis of [post-traumatic stress disorder ('PTSD')]. To begin, this Court finds that Travis has been evaluated by numerous mental health professionals over the course of his life and that Dr. Brook is the only one who has diagnosed him with PTSD. For

that reason alone, this Court views Dr. Brook's diagnosis with great skepticism.

"When asked how he arrived at his diagnosis of PTSD, Dr. Brook replied, 'So my diagnosis was based on the results of psychometric testing, mainly the TSI-2, my clinical interview, and the review of records.' When asked whether it is possible to diagnose PTSD without administering a test, such as the TSI or MMPI, he conceded, 'I'd say that's -- that's possible.' Nonetheless, Dr. Brook admitted that clinicians commonly diagnose PTSD just based on the interview and without testing.

"In explaining his finding that Travis does not have PTSD, Dr. King persuasively testified as follows:

"'Well, [PTSD] is an anxiety disorder primarily, and it is manifested by overt signs of agitation, withdrawal, emotional numbing, avoidance of talking about specific incidents that caused the trauma, suspiciousness, startle responses, things of that nature.

"'When I'm dealing with people who I evaluate clinically, what I'm looking for first is overt evidence of any of those symptoms in my presence. I had spent, like I said, 12 to 14 hours with Mr. Travis. He never showed any of those symptoms. I've sat in court now today for four or five hours. He's shown no evidence of any startle response. He's not agitated.

"'....

"'And what I observed is that he has no overt symptoms of suspiciousness, startle response, no agitation. He's not been anxious. He's engaged in animated discussions with his counsel and other

91

people. When people come into the room, he doesn't show any indications that he is concerned about that. So I've seen no evidence whatsoever now or in the past that he has any of those symptoms.'

"Dr. King administered the MMPI-2 in 2006, and Travis invalidated it by exaggerating symptoms. Dr. King reiterates that there is no evidence that Travis had any PTSD either in 2006 or 2017.

"Having carefully considered the testimony from both experts regarding the question of PTSD, this Court credits Dr. King's conclusion that he finds no evidence that Travis now suffers or ever has suffered from that disorder.

"Third, this Court notes that Dr. Brook went so far as to diagnose Travis as suffering from a phenomenon that he referred to as complex developmental trauma disorder. When asked about his diagnosis of that disorder, Dr. Brook [] testified that it is [PTSD] plus. He conceded that complex developmental trauma disorder is not included as a separate disorder in the DSM-5. When asked whether Travis suffers from that 'disorder,' Dr. King stated there is no such diagnosis.

"Given that there is no diagnosis for 'complex developmental trauma disorder' in the DSM-V, this Court disregards Dr. Brook's testimony diagnosing him with that 'phenomenon.'

"Notably as well, Dr. Brook stated he could not reliably diagnose Travis's mental status or neuropsychological status in 1991, but nonetheless believes Travis has suffered from PTSD most of his life.

"Because Travis's claim that his trial counsel were ineffective for failing to obtain a neuropsychologist to evaluate

him is premised on the questionable testimony of Dr. Brook, the Court finds that Travis has failed, to satisfy his burden of showing deficient performance or prejudice under <u>Strickland</u> with regard to this claim.  For that reason, this claim is denied under Rule 32.7(d) of the Alabama Rules of Criminal Procedure."

(C. 4091-94.)

In his brief on appeal, Travis maintains that his counsel were ineffective for failing to obtain a psychological evaluation after they learned from Dr. Atkins's report that Travis needed further evaluation. Travis also takes issue with the circuit court's discrediting Dr. Brook's testimony.

To start, Travis's complaint about the circuit court's weighing Dr. King's testimony more favorably than Dr. Brook's testimony is without merit.  This Court has explained:

> "'"The resolution of ... factual issue[s] required the trial judge to weigh the credibility of the witnesses. His determination is entitled to great weight on appeal. ... 'When there is conflicting testimony as to a factual matter ..., the question of the credibility of the witnesses is within the sound discretion of the trier of fact. His factual determinations are entitled to great weight and will not be disturbed unless clearly contrary to the evidence.'"'

93

"'Calhoun v. State, 460 So. 2d 268, 269-70 (Ala. Crim. App. 1984) (quoting State v. Klar, 400 So. 2d 610, 613 (La. 1981)).'

"[Brooks v. State,] 929 So. 2d [491] at 495-96 [(Ala. Crim. App. 2005)]."

Broadnax v. State, 130 So. 3d 1232, 1240-41 (Ala. Crim. App. 2013). Nothing in the record on appeal shows that the circuit court's decision to find Dr. King more credible that Dr. Brook was "clearly contrary to the evidence." Thus, the circuit court's credibility determination in this case will not be disturbed.

As for Travis's argument that his counsel were ineffective for failing to obtain a psychological evaluation after they learned from Dr. Atkins's report that Travis needed further evaluation, Travis failed to satisfy his burden of proof at the evidentiary hearing that his counsels' performance was deficient for failing to hire a mental-health expert.

As highlighted by Travis's argument and by the circuit court's credibility determinations outlined above, "expert witnesses can have varying opinions about the same subject matter." Peraita v. State, [Ms. CR-17-1025, Aug. 6, 2021] ___ So. 3d ___, ___ (Ala. Crim. App. 2021). Because expert opinions regarding the same subject matter are not

94

interchangeable, it is incumbent upon a petitioner who claims that his or her counsel was ineffective for failing to hire an expert witness to prove at an evidentiary hearing (1) that such an expert witness exists, (2) what the expert witness's testimony would have been at trial had his counsel called that expert witness to testify, and (3) that the expert witness was both willing <u>and</u> able to testify at the petitioner's trial. <u>See</u> <u>Brooks</u>, 340 So. 3d at 437 ("[T]o obtain relief on a claim that counsel were ineffective for failing to hire an expert witness, the petitioner must first <u>plead</u> the name of that expert, the substance of that expert's testimony, and that the expert is willing and available to testify at the petitioner's trial; then the petitioner must <u>prove</u> each of those allegations at an evidentiary hearing."). What is more, because "we must evaluate counsel's performance based on counsel's perspective at the time," <u>Woodward v. State</u>, 276 So. 3d 713, 763 (Ala. Crim. App. 2018), counsel cannot be ineffective for failing to present the opinion of an expert witness who was not an expert in their respective field at the time counsel is alleged to have rendered the ineffective assistance. <u>See, e.g.</u>, <u>Brooks</u>, 340 So. 3d at 438 ("Given that Dr. Agharkar was in the middle of his forensic psychiatry fellowship and was not yet board-certified in that field at the

95

time of Brooks's trial ... , we fail to see how Brooks's counsel were ineffective for failing to hire Dr. Agharkar ... as [an] expert witness[] in [his] respective field[].").

Here, to prove his claim that his trial counsel were ineffective for failing to have Travis examined after they received Dr. Atkins's report, Travis presented the testimony of Dr. Brook. Dr. Brook said that he performed a "neuropsychological assessment" on Travis and that he diagnosed Travis with "posttraumatic stress disorder and, also, complex developmental trauma disorder that, in the Diagnostic and Statistical Manual, is diagnosed under other specified trauma and stressor-related disorder." (Evid. Hrg. Oct. 2017, R. 27, 33.) Although Dr. Brook testified that he is a licensed clinical psychologist, Dr. Brook explained that he did not receive his Ph.D. in clinical psychology until 2011 and that he was not licensed in clinical psychology until 2013 -- nearly, 20 years after Travis's trial. (Evid. Hrg. Oct. 2017, R. 17-18.)

Given that Dr. Brook was not a licensed clinical psychologist until nearly 20 years after Travis's trial, Travis failed to satisfy his burden of proving that Dr. Brook was "willing and available" to provide an expert opinion at Travis's trial. Consequently, Travis failed to prove that his

counsels' performance was deficient for failing to hire Dr. Brook as a mental-health expert. Thus, the circuit court did not err when it denied this claim.

Even so, as explained above, the circuit court correctly concluded that Travis failed to satisfy his burden of proving that his counsel performed deficiently because his claim is "premised on the questionable testimony of Dr. Brook," whose opinion was at odds with Dr. King's finding that Travis did not suffer from post-traumatic stress disorder, who diagnosed Travis with "complex developmental trauma disorder" when no such diagnosis exists in the DSM-V (a manual of mental disorders, which did not exist at the time of Travis's trial), and who conceded that "he could not reliably diagnose Travis's mental status or neuropsychological status in 1991, but nonetheless believes Travis has suffered from PTSD most of his life." (C. 4093-94.) What is more, Travis failed to prove that he was prejudiced by his counsels' failure to obtain a neuropsychological expert to evaluate him.

Accordingly, Travis is due no relief as to this claim.

<u>II.A.2.</u>

Travis next argues that his counsel were ineffective during the penalty phase of his trial because, he says, they "presented a contradictory and confused mitigation case." (Travis's brief, p. 78.) Specifically, Travis argues that his trial counsel, Elbrecht,

> "stated in his 2002 affidavit that his strategy during the penalty phase was to emphasize to the jury Travis's abusive childhood. (Elbrecht Affidavit, Ex. 1 at 1.) But at the trial itself, he presented only incoherent details about Travis's early childhood (until age 6) and then affirmatively disclaimed the notion that Travis's childhood was relevant to his moral culpability. The result of such a haphazard presentation of evidence was that no reasonable jury could have understood and meaningfully weighed the mitigating value of the evidence of Travis's objectively horrific childhood and upbringing."

(Travis's brief, p. 78.) Travis further argues that his counsels' penalty-phase opening statement was insufficient; that his counsel presented "a string of obviously unprepared and rushed witness examinations"; that his counsel presented only one exhibit to the jury, which, he says, consisted of several documents that "were organized in such a way as to suggest trial counsel dropped them on the floor, re-shuffled them, and mixed them with other files before finalizing"; that his counsel failed to properly examine Findley, who, he says, could have explained Exhibit 1 to the jury; that his counsels' closing argument "undercut any strategy

[they] may have had" because, he says, counsel "told the jury that he was not trying to blame the crime on a 'poor childhood'" and "purposefully distanced [counsel] from Travis"; and that his counsel "failed to object to the submission of the penalty phase case to the jury at 5:09 p.m. on a Saturday evening." (Travis's brief, pp. 78-83.)

Travis also argues that his counsel were ineffective for failing to present the following evidence during the penalty phase:

- "Travis's birth mother consumed excessive amounts of alcohol while she was pregnant with him." (Travis's brief, p. 84.)

- "Travis watched Crabtree chase his birth mother with a shotgun, and beat her on multiple occasions." (Travis's brief, p. 84.)

- "Travis watched as his sister was raped." (Travis's brief, p. 84.)

- "Travis suffered from debilitating polysubstance abuse: he would inhale gasoline until he passed out to escape the trauma he had suffered. He used numerous drugs, like acid and crack cocaine. (C.R. 1258.) In other words, his trauma forced him to self-medicate to the point that he put his own life at risk-including attempting suicide by overdose. (H.R. 392:3-10.)" (Travis's brief, p. 84.)

- "Travis's history of suicide attempts as a result of his past traumas. (See, e.g., Pet. Ex. 10 at P_001081.) Trial counsel admitted at the Rule 32 hearing that he could not recall a reason for failing to include this information

99

in his presentation. (H.R. 1157:13-1158:4.)"  (Travis's brief, p. 84.)

- "Travis's consistent behavioral problems, including walking on all fours like an animal and throwing himself into the wall. (C.R. 915.)"  (Travis's brief, p. 84.)

- "Travis's consistent difficulty and mistreatment at the various youth centers and schools."  (Travis's brief, p. 84.)

- "Travis's adoptive mother, Marian Travis, was an abusive alcoholic. Overwhelming evidence showed that Travis's mother was an out of control alcoholic. (See Id. 1073, 927-28 (DHR records detailing reports of Marian Travis's severe alcohol problems in the home and how this was affecting Travis); Resp. Ex. 8 at 45:18-48:4.) This was particularly traumatic for Travis as he had been removed from his mother and sisters due in large part to his own mother's alcoholism. (See C.R. 1231-1254.)."  (Travis's brief, pp. 84-85.)

As the State correctly points out, in raising the broad argument on appeal that his counsel were ineffective because they "presented a contradictory and confused mitigation case," Travis "fails to tie this argument to any of the specific claims that he raised in his fifth amended petition, much less address the circuit court's findings and conclusions regarding a particular claim that he raised in that petition and argue why he believes the circuit court erred in denying relief on that claim." (State's brief, p. 78.)  More problematic, however, is the fact that Travis

100

appears to take several individual claims of ineffective assistance of counsel that he raised in his fifth amended petition and lump them together under the broad categorization that his counsel presented a "contradictory and confused mitigation case," leaving this Court to figure out which of Travis's claims raised in this section of his appellate brief relate to the claims that he raised in his fifth amended petition that the circuit court denied. It is not the function of this Court to sift through Travis's arguments in his appellate brief and his allegations in his fifth amended petition and piece Travis's arguments together in a way that would allow this Court to review the circuit court's judgment. "Judges are not like pigs, hunting for truffles buried in briefs." United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991). For this reason, we conclude that Travis has failed to satisfy Rule 28(a)(10), Ala. R. App. P., and his arguments are deemed waived.

Travis also fails to satisfy Rule 28(a)(10) because he neither explains how he satisfied his burden at the evidentiary hearing of proving the claims of ineffective assistance of counsel that he raised in his fifth amended petition, nor does he explain how the circuit court's denial of those claims of ineffective assistance of counsel was in any way

101

erroneous. "This Court has held that similar failures of argument do not comply with Rule 28(a)(10), Ala. R. App. P., and constitute a waiver of the underlying postconviction claim. See, e.g., Morris v. State, 261 So. 3d 1181 (Ala. Crim. App. 2016)." Woodward, 276 So. 3d at 746.

## II.A.3.

Finally, Travis argues that his counsel were ineffective during the penalty phase of his trial because they "fail[ed] to obtain a mitigation expert." (Travis's brief, p. 85.) According to Travis, "[p]art of what would have constituted an effective presentation, and effective representation under the Constitution, would have been to use a qualified mitigation expert to detail and explain the full extent of Travis's trauma and how that trauma affected his development into adulthood." (Travis's brief, p. 85.)

In his fifth amended petition, Travis alleged that his counsel were ineffective during the penalty phase of his trial because they "failed to provide expert testimony about [his] psychological problems and the effects of his early childhood trauma." (C. 2045.) In raising this claim, Travis alleged that, if his counsel had "retained a social work/mitigation expert for trial, [they] would have been able to present evidence … to

counter the State's theory for the sentencing phase, that Mr. Travis had every opportunity to succeed once he no longer lived with his biological mother"; "the jury would have heard that Mr. Travis had a psychological evaluation at age thirteen that showed the effects of his childhood abuse had already profoundly affected him" -- i.e., "he was anxious and depressed and had threatened suicide"; and "the jury would have heard about the dire impact Mr. Travis's childhood abuse had on his life." (C. 2047-48.) Travis further alleged that Dr. Marti Loring could have testified as a "social work/mitigation expert." (C. 2048.) The circuit court gave Travis an opportunity to prove this claim at an evidentiary hearing.

At the hearing, Travis called Dr. Loring to testify about the benefits of counsel hiring a mitigation expert for the penalty phase of trial, her work as a social worker in this case, and what she had learned about Travis's childhood that she thought would have been beneficial to present at the penalty phase. Travis also called three of his trial counsel to testify at the hearing. The lead counsel in Travis's case -- George Elbrecht -- testified that they had asked the trial court for a "pre-sentence investigation expert" (Evid. Hrg. Oct. 2018, R. 221), but the trial court denied his request (Evid. Hrg. Oct. 2018, R. 222). Elbrecht explained,

however, that the trial court had provided them with funds to hire an investigator -- Allen McGraw -- who investigated Travis's background and provided them helpful mitigation information. Elbrecht said that they told McGraw "to do as thorough an investigation as he could" into Travis's background. (Evid. Hrg. Oct. 2018, R. 290.) Elbrecht also said that the strategy of the mitigation case was to show that Travis "had a terrible childhood." (Evid. Hrg. Oct. 2018, R. 447.) Elbrecht explained that, in preparation for the penalty phase, they obtained numerous records, including records from DHR, and that they introduced those records during the penalty phase. (Evid. Hrg. Oct. 2018, R. 458.) Elbrecht further explained that they introduced 5 exhibits during the penalty phase and called 12 witnesses to testify, and that their focus was to show that Travis "was the product of a horrible childhood." (Evid. Hrg. Oct 2018, R. 459.) But Elbrecht said that they did not want to attack Travis's adoptive parents because

> "Mr. and Mrs. Travis were the objects, I think, of great pity at the time of these events. As hostile as the environment was, attacking them would not have helped Mr. Travis, Wayne. Putting on that [Travis's adoptive mother] was an alcoholic, in my judgment, would not have helped Wayne Travis. I thought at the time that the events of his childhood, before he was put into the hands of his parents that adopted him, was something that the jury should know about."

(Evid. Hrg. Oct. 2018, R. 332-33.)

After the evidentiary hearing, the circuit court denied this claim finding that Travis failed "to acknowledge that his counsel called twelve witnesses at the penalty phase of his trial," which included his sisters and a social worker who "testified about the traumatic childhood that Travis and his siblings experienced at the hands of his biological mother and her live-in boyfriend, Jackie Crabtree, from the time that he was born until approximately age five." (C. 4141.) The circuit court noted that Travis relied "solely on the testimony of Dr. Marti Loring to support his claim that his counsel should have called a social worker at his trial," but "much of her testimony focused on Travis's early childhood and background" and, thus, was "cumulative to the testimony that was elicited at trial from [Travis's] sisters and others." (C. 4141-42.) The circuit court also found that Cary Travis -- Wayne's adoptive father -- denied "much of Dr. Loring's testimony that she attributes to him," and that it found Cary Travis more credible than Dr. Loring. (C. 4142.) Additionally, the circuit court concluded that "much of the record refutes Dr. Loring's claims," and that "Dr. Loring chose to disregard information in the record ... that paints Travis in a negative light and instead chose

to focus on information that she decided could assist him with his attack on his conviction and sentence." (C. 4142.) Thus, the circuit court concluded, Dr. Loring is "less than a credible witness." (C. 4142.)

Although it found Dr. Loring "less than" credible, the circuit court concluded that Travis had "satisfied his burden of proving deficient performance with regard to this claim." (C. 4143.) But it also concluded that Travis had "failed to satisfy his burden of proving prejudice" because his trial counsel "effectively elicited compelling testimony regarding his traumatic childhood from his sisters and other witnesses at the penalty phase of his trial." (C. 4143.) Although the circuit court found that Travis had satisfied his burden of establishing that his counsel were deficient in failing to hire a mitigation expert, we question the circuit court's conclusion.

Indeed, this Court has explained that "'[h]iring a mitigation specialist in a capital case is not a requirement of effective assistance of counsel.' Phillips v. Bradshaw, 607 F.3d [199,] 207-08 [(6th Cir. 2010)]." Daniel v. State, 86 So. 3d 405, 437 (Ala. Crim. App. 2011). This is especially true in cases like this one where trial counsel hired an independent investigator -- Allen McGraw -- who had previously worked

on two capital cases as an investigator and who conducted an investigation not only into the facts surrounding Travis's case, but also into any potentially mitigating evidence to aid the defense during the penalty phase of Travis's trial. According to McGraw's affidavit, which the State admitted during the evidentiary hearing, McGraw explained:

> "During the course of my investigation, I spoke with and interviewed countless people. During my meetings with Wayne, I repeatedly asked for names of individuals that could provide information in preparing his guilty and penalty phase defense. I tracked down, or at least attempted to track down, every bona fide lead Wayne gave me.

> "I met with Wayne's adoptive parents on more than one occasion. I even met with and interviewed Wayne's adoptive aunt and uncle. These people, however, were not able to provide much information that was helpful during the guilt phase of Wayne's trial. They did provide information that was used at the penalty phase of the trial.

> "I also traveled to north Alabama and met with Wayne's biological family as part of my penalty phase investigation. Specifically, I met with Wayne's biological mother, three of his sisters, and two brothers-in-law. Wayne's biological father would not meet with me. Wayne also had another sister that would not meet with me. Wayne's biological mother denied doing anything abusive or neglectful to her son. Wayne's sisters provided a lot of insight into Wayne's childhood before he was placed in foster care.

> "In addition to speaking with members of Wayne's adoptive and biological family in preparation for the penalty phase, I also interviewed anyone and everyone I could that knew Wayne growing up. I spoke to the law enforcement and

107

other state officials, what is now the Department of Human Resources ('DHR'), that were involved in taking Wayne and his sisters away from their biological mother. I also interviewed the foster family Wayne was placed with before he was adopted. I interviewed Wayne's school teachers as well as personnel at the various 'Youth Homes' and detention facilities that Wayne lived in. I even talked to people that lived near where Wayne lived with his adoptive parents as well as several other people in the community. I also met Wayne's daughter and interviewed his daughter's mother. Some of these people were able to tell me about the tragic life Wayne was subjected to before he was adopted. While Wayne's life before he was adopted was absolutely horrid, the people that knew him after his adoption described Wayne as someone that only caused problems for himself and others. In fact, the people in the community where his adoptive family lived were afraid of Wayne. Even Wayne's adoptive parents were afraid of him. My investigation also revealed that Wayne's adoptive mother was an alcoholic.

"....

"During the course of my interviews with Wayne's biological family, it became apparent that Wayne was subject to just about anything happening to him."

(Fourth Supp. Record, C. 11-12.)

In other words, although Travis's trial counsel did not have a "mitigation expert," Travis's counsel had an investigator who conducted an investigation into Travis's background for purposes of presenting mitigation evidence during the penalty phase of Travis's trial.

Regardless, the circuit court correctly concluded that Travis failed to satisfy his burden of proving that he was prejudiced by his counsels' failure to hire Dr. Loring as a mitigation expert. Indeed, although Dr. Loring provided testimony about mitigating evidence that she could have discovered had she been retained as a mitigation expert, that mitigating evidence was either cumulative to evidence presented during the penalty phase, contradicted evidence that was presented during the penalty phase, was inconsistent with trial counsel's mitigation strategy, or was, as the circuit court found, simply not credible. Thus, even if the circuit court was correct in finding that Travis's trial counsel should have obtained a mitigation expert, the trial court did not abuse its discretion in finding that Travis failed to establish that he was prejudiced by his counsel's failure to hire Dr. Loring as a mitigation expert. Travis's counsel presented substantial mitigating evidence, but the jury, and the circuit court, determined that the aggravating factors outweighed the mitigating factors presented by the defense.

Accordingly, the Travis is due no relief on this claim.

## II.B.

Next, Travis argues that his "trial counsel's performance at the penalty phase prejudiced [him]." (Travis's brief, pp. 90-92.) Travis sums up his argument on appeal as follows:

> "Travis was prejudiced by the lack of evidence about his childhood and trauma that the jury did not hear during the penalty phase of his trial -- either because trial counsel did not present it, or presented it in a confusing and inaccessible manner. If the trial court and the jury had the benefit of knowing the multitude of mitigating factors that trial counsel failed adequately to investigate and identify, there is at least a reasonable probability that Travis would have received a lesser sentence."

(Travis's brief, p. 92.)

As best as we can tell, Travis is raising a stand-alone argument about the Strickland v. Washington, 466 U.S. 668 (1984), prejudice prong as to the penalty-phase claims addressed above, but Travis's arguments concerning prejudice are without merit. As discussed above, none of Travis's penalty-phase claims of ineffective assistance of counsel entitle him to any relief because he has either waived the claim by not adequately presenting it to this Court, because his counsel did not perform deficiently, or because he failed to establish any prejudice by his trial counsel's actions. Accordingly, Travis is due no relief on this claim.

### III. "Cumulative Effect" of Ineffective Assistance of Counsel

Finally, Travis argues that the circuit court erred because it "failed to consider the cumulative effect of trial counsel's ineffective assistance." (Travis's brief, p. 92.) According to Travis, "[w]hether 'counsel's performance was deficient' and whether that 'deficient performance prejudiced the defense' requires an examination of counsel's entire performance, not just the individual aspects of that performance." (Travis's brief, p. 93.)

> "But 'Alabama does not recognize a "cumulative effect" analysis for ineffective-assistance-of-counsel claims.' Carruth v. State, 165 So. 3d 627, 651 (Ala. Crim. App. 2014). We have repeatedly declined similar requests from petitioners to do so. See, e.g., Mashburn v. State, 148 So. 3d 1094, 1118 (Ala. Crim. App. 2013); Washington, 95 So. 3d at 58. And because [Travis] has shown no deficient performance, there is no opportunity for this Court to engage in a cumulative-effect analysis."

Lewis v. State, 333 So. 3d 970, 1016 (Ala. Crim. App. 2020) (opinion on return to remand). Even if this Court accepts the circuit court's conclusion that Travis's counsel were deficient in failing to hire a mitigation expert, an analysis of cumulative error would not be necessary in relation to this singular finding of deficient conduct. Accordingly, Travis is not entitled to any relief on this claim.

## Conclusion

111

Based on these reasons, the judgment of the circuit court is affirmed.

AFFIRMED.

Windom, P.J., and McCool and Minor, JJ., concur. Kellum, J., concurs in the result.